**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RAYMOND THOMAS, and WILLIAM PORTER, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>SHILOH INDUSTRIES, INC, RAMZI HERMIZ, and THOMAS M. DUGAN,<br><br>Defendants. | Case No.: 1:15-cv-07449-KMW<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

# TABLE OF CONTENTS


I. NATURE OF THE ACTION AND OVERVIEW ........ 1

II. JURISDICTION AND VENUE ........ 7

III. PARTIES ........ 8

IV. RELEVANT NON-PARTY WITNESSES WITH PERSONAL KNOWLEDGE OF RELEVANT INFORMATION ABOUT DEFENDANTS' ACTIONS AND STATES OF MIND ........ 10

V. BACKGROUND ........ 11

VI. DEFENDANTS KNOWINGLY AND/OR RECKLESSLY VIOLATED GAAP BY IMPROPERLY ACCOUNTING FOR COST OF GOODS SOLD ........ 12

A. Obligations Imposed by the Securities Laws and GAAP ........ 12

B. The Company's Improper Accounting for Steel Surcharges and Manipulation of COGS and Earnings During the Class Period ........ 14

VII. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ........ 19

A. Shiloh's Materially False or Misleading FY 2014 Financial Results and Financial Statements ........ 20

B. Shiloh's Materially False or Misleading Q1 2015 Financial Reports and Financial Statements ........ 22

C. Shiloh's Materially False or Misleading Q2 2015 Financial Results and Financial Statements ........ 24

D. Defendants' Materially False or Misleading Sarbanes-Oxley Certifications ........ 26

VIII. ADDITIONAL SCIENTER ALLEGATIONS ........ 29

A. The Magnitude of the Restatement Supports a Strong Inference of Scienter ........ 29

B. Defendants' False Sarbanes-Oxley Certifications Support a Strong Inference of Scienter ........ 30

C. Defendants' Attempt to Cover up the True Circumstances Surrounding the Restatement Supports a Strong Inference of Scienter ........ 32

D. Defendants' Knowledge of Prior Accounting Errors and Their Efforts to Stymie Shiloh's Former Head of Internal Audit from Raising Accounting Issues Directly with the Board's Audit Committee Further Support a Strong Inference of Scienter ........ 33

IX. LOSS CAUSATION ........ 34

X. CLASS ACTION ALLEGATIONS ........ 40

XI. UNDISCLOSED ADVERSE FACTS ........ 42

XII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE) ........ 43

XIII. NO SAFE HARBOR ........ 45

XIV. COUNTS ........ 45

XV. PRAYER FOR RELIEF ........ 50

XVI. JURY TRIAL DEMANDED ........ 50

Lead Plaintiff Raymond Thomas and named plaintiff William Porter (together "Plaintiffs"), by and through their attorneys, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief is based upon, among other things, their counsels' investigation, which includes without limitation: (a) review and analysis of regulatory filings made by Shiloh Industries, Inc. ("Shiloh" or the "Company"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Shiloh; (c) investigative interviews with persons having first-hand knowledge of the Company's operations, including former employees of Shiloh; and (d) review of other publicly available information concerning Shiloh.

## I. NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of purchasers of Shiloh securities between January 12, 2014 and September 14, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. This case arises from an accounting fraud committed by the senior executives of defendant Shiloh.

3. Shiloh is a supplier of lightweighting,[1] and noise, vibration, and harshness solutions to automotive, commercial vehicle, and other industrial markets.

4. Throughout the Class Period, Defendants repeatedly presented investors with fraudulent financial results and financial statements that understated the Company's cost of goods sold ("COGS" or "cost of sales") and overstated the Company's gross margins and net income, key metrics for investors to evaluate Shiloh's financial performance.

---

[1] Lightwieghting is an auto industry term that refers to the use of materials and designs that reduce weight and increase fuel efficiency.

5. Because Shiloh operates on very thin gross margins – meaning that its revenue only slightly exceeds the Company's costs associated with creating the sold product – even small manipulations of the Company's gross margins (by either increasing revenue or decreasing costs of goods sold) could have a substantial impact on the Company's bottom line (net income). For this reason, during the Class Period, analysts, investors, and Shiloh management paid very close attention to the Company's gross margins.

6. Defendants perpetrated the accounting fraud by intentionally misallocating surcharges (costs) assessed on steel at the Company's Wellington facility. The fraudulent scheme started by at least the first fiscal quarter of 2014 ("Q1 2014"), with one former employee confirming the fraud had started as far back as July 2013, and continued to grow throughout the Class Period.

7. The Wellington facility is charged additional "surcharges" from steel supplier(s) based on changes in the price of steel, to protect the supplier from shifts in steel prices. Surcharges for physical steel that still remains in Shiloh's possession should be allocated to the Company's "inventory" account. However, under Generally Accepted Accounting Principles ("GAAP"), the surcharge associated with steel that has been used in products and sold by Shiloh should be allocated to the Company's COGS account. The controller of the facility (the "Wellington Controller") was piling up surcharges in inventory and failing to allocate appropriate amounts to the cost of sales account, which had the effect of inflating inventory and understating COGS. As a result, Shiloh's reported gross margin and net income were overstated.

8. These manipulations had significant impacts on the Company's financial results. For example, the Company initially reported a fiscal first quarter 2015 ("Q1 2015") gross margin of 8% when, in reality, it was 7.3%, and overstated net income by more than 50%.

9. Defendants repeatedly touted Shiloh's fraudulent and overstated financial results to investors. For example, during a conference call with analysts and investors to discuss the Company's financial results for the 2015 fiscal second quarter ("Q2 2015"), Defendant Hermiz highlighted that, "compared to our first quarter of 2015, gross margin percentage improved 30% to 10.4% of sales revenue, up from 8% of sales revenue in Q1. In fact, gross margin of 10.4% of sales revenue is the best quarterly performance over the past six quarters." Hermiz also stated that Shiloh was moving from a commodity-based company to a solution-based company with higher margin, and that "this should also lead to gross margin expansion over time."

10. However, soon thereafter, investors started to learn the truth after the fraud could no longer be contained. On September 9, 2015, Shiloh shocked investors when the Company disclosed that it would be unable to file its Quarterly Report on Form 10-Q for the Company's 2015 fiscal third quarter ("Q3 2015")[2] with the SEC within the prescribed/required deadline "because of an ongoing internal investigation into the accounting for certain costs at the Company's facility in Wellington." The Company claimed that ". . . as part of a newly implemented enhanced balance sheet review process encompassing all of the Company's 21 manufacturing facilities, management encountered preliminary indications of a potential issue with respect to the accounting for inventoried costs . . . ." According to the Company, the Audit Committee of the Company's Board of Directors (the "Audit Committee") had commenced a formal investigation, with the assistance of third-party advisors, to assess the nature and extent of any misstatements, and their potential effect on previously issued financial statements and management's internal control over financial reporting. Specifically, Shiloh informed investors that, as of that date, the Company "believe[d] that the majority of this issue is associated with a

---

[2] The Company's fiscal year ends on October 31st.

surcharge assessed on steel at the Company's facility in Wellington, Ohio" and that Shiloh expected "the aggregate impact on Company's net income [would] be in the range of $2.2 million to $2.5 million."

11. Following this revelation, the Company's stock plummeted. Over the next two days, Shiloh's stock declined by $2.37 per share, or 21.5%, to close at $8.62 per share on September 11, 2015.

12. On September 14, 2015 the Company further disclosed that, purportedly as a result of its investigation, it had confirmed the existence of accounting manipulations related to inventoried costs associated with a surcharge assessed on steel at its Wellington facility. The Company further specified that, as a result of the accounting manipulations, reported cost of sales for Q1 2015 and Q2 2015 were "understated by approximately $1.7 million and $1.1 million, respectively, resulting in [a] cumulative overstatement[] of reported . . . net income of approximately $1.2 million and $0.8 million, respectively." The Company also disclosed that as a result of the misstatements, its Q1 2015 and Q2 2015 financial reports needed to be restated and therefore should no longer be relied upon. In addition to the revelation of the accounting manipulations, the Company disclosed that "a material weakness existed in the Company's internal control over financial reporting at January 31, 2015 and April 30, 2015 . . . ." Additionally, the Company announced that effective September 8, 2015, Defendant Thomas Dugan had been stripped of his principal accounting officer title and duties.

13. Also on September 14, 2015, the Company filed amendments to its Q1 2015 and Q2 2015 Quarterly Reports with the SEC on Form 10-Q/A ("the Restatement"), restating the Company's financial results for those periods. The Restatement confirmed that the Company understated cost of sales, overstated gross margin, and overstated net income for Q1 2015 and

Q2 2015. The Restatement also confirmed the existence of a material weakness in the Company's internal controls over financial reporting for Q1 2015 and Q2 2015. In addition, the Company disclosed that the accounting manipulation related to inventoried costs was not limited to fiscal year 2015, but extended into fiscal year 2014, stating: "[t]he adjustments for the three-month period ended January 31, 2015 included certain immaterial amounts from fiscal 2014 totaling $.982 million pre-tax primarily related to inventoried costs."

14. On this news, the Company's stock price fell another $1.68, or 16.3%, to close at $8.58 per share on September 15, 2015.

15. Although the Company attempted to spin the fraud as an isolated incident at just one facility, it was rooted at the heart of the Company. While Shiloh maintains twenty-one manufacturing facilities, the facility in Wellington, Ohio, one of the Company's largest operations, is effectively Company's "crown jewel," located approximately twenty-five miles from the Company's headquarters in Valley City, Ohio. Through shrewd accounting manipulations at this one facility, Shiloh was able to inflate net income ***Company-wide*** by more than 50% in Q1 2015, and more than 13% in Q2 2015.

16. Defendants' assertion that discovery of the fraud resulted from their purportedly proactive efforts – *i.e.*, "as part of a newly enhanced balance sheet review process encompassing all of the Company's 21 manufacturing facilities, management encountered preliminary indications of a potential issue with respect to the accounting for inventoried costs" – does not tell the full story and is directly belied by the accounts of former employees. As set forth below, in or around July of 2015, a cost accountant at the Wellington facility confronted the Group Controller (who reported to Defendant Dugan) seeking to address the fraudulent surcharge

accounting issue. Apparently unable to keep the issue under wraps any longer, Defendants were forced to reveal the fraud.

17. During the Class Period, Defendants knew and/or recklessly disregarded the falsity of Shiloh's financial results. As set forth herein, former Shiloh employees have described how Defendants would set "impossible" budgets and placed unbelievable amounts of pressure on employees to meet their numbers, enough pressure to result in one former employee undergoing psychotherapy. One confidential witness noted that there was a lot of pressure at the Wellington facility in particular because management kept firing employees at the plant. However, as the former Cost Accountant at Wellington (*i.e.*, the employee who finally raised the issue and would no longer stay silent) described, as long as Wellington was hitting its numbers, corporate was not looking too closely and did not want to ask any questions. One confidential witness (Confidential Witness 4) even remarked Hermiz and Dugan were the type of people that would push the boundaries of GAAP.

18. Defendants had ample access to information specific to the Wellington facility that revealed the accounting manipulations throughout the Class Period. Defendants had direct access to the Wellington facility's accounting entries through the Company's enterprise resource planning ("ERP") system. Defendants also held monthly business reviews, and as stated by a confidential witness, daily meetings were instituted in April 2014. Moreover, every quarter, each plant Controller produced a Power Point presentation for management that laid out, business operations, accounting treatment for any significant transactions, and trend analysis for assets and liabilities with information regarding variances, revenue, ***all inventory accounts***, and ***payables***. In addition to having access to the information revealing the accounting manipulation,

Defendants were aware of the Wellington facility's unique success, high gross margins, and all-around exceptional performance relative to the rest of Shiloh's manufacturing facilities.

19. In fact, Defendants had already demonstrated their willingness to disregard or conceal issues with the Company's accounting and internal controls even prior to the revelation of the manipulations at the Wellington facility. For example, another confidential witness (Confidential Witness 3 ("CW3")), who served as the Shiloh's Head of Internal Audit, indicated that Defendants Hermiz and Dugan had confronted CW3 about bringing a prior accounting problem to the attention of the Audit Committee. According to CW3, around December 2013 there had been accounting errors regarding fixed assets, and the Company had been trying to capitalize expenses inappropriately. CW3 investigated and received about 40 pages of documentation from plant managers, which CW3 turned over to the Audit Committee. Even though CW3 was permitted to provide this information to the Audit Committee (because CW3 reported to both the head of the Audit Committee and Defendant Dugan), CW3 was shortly thereafter pulled into a meeting with Defendants Hermiz and Dugan where, according to CW3, Defendants Hermiz and Dugan made it perfectly clear that CW3 would have a problem if CW3 ever again went to the Audit Committee without first talking to them.

20. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II. JURISDICTION AND VENUE

21. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

22. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

23. Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. The Company's shares are also traded within this Judicial District.

24. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

25. Lead Plaintiff Raymond Thomas, as set forth in the certification he previously filed with the Court and incorporated by reference herein, purchased Shiloh common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

26. Plaintiff William Porter, as set forth in the attached certification, purchased Shiloh common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

27. Defendant Shiloh is a Delaware corporation with its principal executive offices located at 880 Steel Drive, Valley City, Ohio 44280. During the Class Period, Shiloh, through its officers and directors, published periodic filings with the SEC and made public statements that

contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.

28. Defendant Ramzi Hermiz ("Hermiz") was, at all relevant times, President and Chief Executive Officer ("CEO") and a director of Shiloh. Hermiz has been President and CEO since September 2012, and was elected to the Board of Directors in 2013. Prior to joining the Company, Hermiz served as Senior Vice President, Vehicle Safety and Protection of Federal-Mogul since 2009. Hermiz was also a member of Federal-Mogul's Strategy Board since 2005, and served as Federal-Mogul's Senior Vice President, Aftermarket Products and Services from 2007 to 2009 and Senior Vice President of Sealing Systems from 2005 to 2007.

29. Defendant Thomas M. Dugan ("Dugan") was at all relevant times Vice President of Finance and Treasurer of Shiloh. Dugan has been with the Company since December 1999. Dugan was also principle accounting officer of the Company until September 8, 2015, and principle financial officer until December 16, 2015.

30. Defendants Hermiz and Dugan are collectively referred to hereinafter as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Shiloh's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations

which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV. RELEVANT NON-PARTY WITNESSES WITH PERSONAL KNOWLEDGE OF RELEVANT INFORMATION ABOUT DEFENDANTS' ACTIONS AND STATES OF MIND

31. Confidential Witness 1 ("CW1") was a Cost Accountant at the Wellington plant from approximately July 2013 to approximately November 2015. CW1 reported to the Wellington Plant Controller who reported to a Group Controller that oversaw multiple plants (about 25% to 30% of the Company's plants as described by CW1), who in turn reported to Defendant Dugan. CW1 was the Shiloh employee who confronted the Group Controller regarding the improper accounting at Wellinton.

32. Confidential Witness 2 ("CW2") was a Corporate Staff Accountant at Shiloh. CW2 worked for Shiloh from approximately July 1999 to approximately May 2015. CW2 reported to the Corporate Accounting Manager, who in turn (from approximately March 2015) reported to the Vice President Corporate Controller. CW2 stated that he[3] had a series of conversations with CW1 related to the accounting for surcharges at the Wellington facility prior to public disclosure of the issue.

33. Confidential Witness 3 ("CW3") was the Head of Internal Audit at Shiloh from approximately July 2012 to approximately January 2015. CW3 reported directly to Defendant Dugan and the Chairman of the Audit Committee.

---

[3] The pronoun "he" will be used to refer to confidential witnesses regardless of the actual gender of the witness to conceal their identities.

34. Confidential Witness 4 ("CW4") was a Director of Tax at Shiloh from approximately September 2009 to approximately September 2015. CW4 reported to Defendant Dugan, and had some interaction with Defendant Hermiz.

## V. BACKGROUND

35. Shiloh is a supplier of, lightweighting, noise, vibration, and harshness solutions to automotive, commercial vehicle, and other industrial markets. The Company's products purportedly focus on balancing the need to reduce cost, weight and part complexity with the need to enhance performance, safety, and fuel efficiency.

36. The Company produces components primarily for body, chassis, and powertrain systems. The Company's customers include major brands such as Honda, Toyota, General Motors, and Ford, as well as many others.

37. Due to the nature of the business, Shiloh operates on a very thin gross profit margin.[4] As a result, even minor fluctuations in gross margin can have dramatic impacts on the Company's bottom line. For this reason, gross margin was an area of intense focus for both Shiloh management and the market.

38. For the four quarters of fiscal year 2014, Shiloh reported gross margins of 9.7%, 10%, 10.2%, and 6.9%, respectively. For Q1 and Q2 2015, Shiloh reported gross margins of 8% and 10.4%, respectively.

39. Historically, Shiloh's gross margins have struggled in comparison to its peers. As pointed out by a report published on September 17, 2015 on *Seeking Alpha*, "Shiloh's gross

---

[4] Gross margin is defined as the company's revenue minus the cost of goods sold, divided by the company's revenue: (revenue – cost of goods sold)/revenue. Put another way, it is a company's gross profit (revenue – cost of goods sold) divided by the company's revenue. The higher the gross margin, the more revenue the company retains after covering the cost of creating the product. For example, a 10% gross margin implies that for every $10 of revenue, the product sold to generate that revenue cost $9.

margins have averaged 8.85% over the past 5 years compared to the industry average of 30.0%. The low margins make it more difficult for the company to squeeze out profit; operating margins have averaged only 2.0% in the past 5 years."

## VI. DEFENDANTS KNOWINGLY AND/OR RECKLESSLY VIOLATED GAAP BY IMPROPERLY ACCOUNTING FOR COST OF GOODS SOLD

### A. Obligations Imposed by the Securities Laws and GAAP

40. GAAP are the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

41. The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

42. The FASB established the Accounting Standards Codification ("ASC") as the source of authoritative GAAP recognized by the FASB to be applied by non-governmental entities. Rules and interpretive releases of the SEC under authority of the federal securities laws are also sources of authoritative GAAP for SEC registrants. In addition to rules and interpretive releases, the SEC issues Staff Accounting Bulletins ("SABs") that represent practices followed by the staff in administering SEC disclosure requirements, and Staff Announcements and Observer comments at Emerging Issues Task Force meetings to publicly announce its views on certain accounting issues for SEC registrants. ASC 105-10-05-1.

43. Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are *presumed* to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that

would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

44. Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted accounting principles is an implicit and integral part of management's responsibility.

AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

45. SAB 99 states that "among the considerations that may well render material a quantitatively immaterial statement of a financial statement item are—whether the misstatement masks a change in earnings or other trends."

46. By issuing a restatement, a company acknowledges that its financial statements for the restated periods were materially inaccurate, did not comply with GAAP, and were therefore materially false and misleading. 17 C.F.R. § 210.4-01(a)(1)

47. In accounting for inventory and costs of sale, ASC Topic 330-10, *Inventory* ("ASC 330-10"), provides that the "major objective of accounting for inventories is the proper determination of income through the process of matching appropriate costs against revenues." ASC 330-10-10-1. Inventories are accounted for by their costs – including both the price of acquisition and production. ASC 330-10-30. Revenues are obtained from the sale of inventory. Inventory is thus the costs applicable to goods on hand after matching appropriate costs of goods sold [or "costs of sales"] with concurrent revenue. ASC 330-10-05-2.

**B. The Company's Improper Accounting for Steel Surcharges and Manipulation of COGS and Earnings During the Class Period**

48. Throughout the Class Period, Shiloh improperly accounted for steel surcharges and thereby manipulated the Company's financial results and earnings. Specifically, Shiloh's financial statements violated GAAP because Shiloh failed to appropriately match costs to revenue, and instead improperly allocated costs to the inventory account at the Wellington facility.

49. Steel was one of the key raw materials used by Shiloh for manufacturing its products. Because the market price of steel can change, Shiloh's suppliers invoiced Shiloh for surcharges to protect themselves from fluctuations in the price of steel. If the price of steel increased, the supplier would charge Shiloh an additional surcharge amount to cover the increase. Shiloh failed to appropriately allocate the surcharges for steel products the Company had already sold to "cost of sales" (*i.e.* COGS), and instead allocated those costs to the inventory account, thereby failing to properly match revenues to costs, inflating inventory levels, and decreasing the Company's cost of goods sold.

50. In the Restatement, the Company admitted that it engaged in improper accounting for COGS and inventory during fiscal year 2014 through Q2 2015. Specifically, the Company admitted that the Company's previously issued condensed, consolidated financial statements for Q1 2015 and Q2 2015 should no longer be relied upon because of errors related to the understatement of consolidated cost of sales of approximately $1.7 million and $1.1 million, respectively. According to the Company, this resulted in cumulative overstatements of reported gross profit of $1.9 million and $1.3 million, respectively, and net income of approximately $1.2 million and $0.8 million, respectively.

51. The Company admitted that improper accounting entries were booked at the Wellington plant and that the financial leader at the Wellington plant (the plant controller) engaged in intentional acts to understate the cost of sales related to inventoried costs at the Company's Wellington facility, the majority of which was associated with the steel surcharges. Furthermore, additional entries specific to the Wellington facility were identified that included certain amounts, such as prepaid accounts, that should have been expensed during the earlier periods.

52. The Individual Defendants knew or recklessly disregarded that the Company's financial results were overstated due to the improprieties and inappropriate accounting entries at the Wellington facility. As alleged herein, former Shiloh employees from both the corporate level and at the Wellington plant facility, indicated that the Individual Defendants: (1) set impossible targets for the financial and/or functional leaders at the Wellington plant facility; (2) placed undue pressure on the financial and/or functional leaders of the Wellington plant facility; and (3) did not want to ask any questions nor know about how the Wellington facility was achieving these impossible financial targets.

53. CW2, a former corporate level staff accountant, stated that CW2 had a series of conversations with CW1 (the cost accountant for the Wellington plant facility) during which CW1 told CW2 that there were shenanigans going on with surcharge accounts. According to CW2, CW1 told him that the Controller at the Wellington facility had intentionally made inappropriate accounting entries because the Controller was under pressure.

54. CW2 explained that once per year, the cost accountant and plant controller associated with each manufacturing facility would develop a budget for the coming year, but that senior management would "knock it down" four or five times, and that, as a result, some budgets

were ludicrous. CW2 elaborated that in order to make the budget, everything had to go perfectly. For example, according to CW2, the plant workers had to be willing to work overtime, and there could not be any scrap.[5] CW2 stated that it was impossible to make budget, and that every month there was a lot of pressure to explain variances. Additionally, CW2 indicated that the plant controller was the person who had to "take the heat" and be accountable for mistakes at the plant, and that there was a lot of pressure at the Wellington facility because management was constantly firing people.

55. Further, CW2 also indicated that the pressure to make numbers was on the plant Controller, and CW2 identified Defendants Hermiz and Dugan (as well as Corporate Controller, DeThomas who joined Shiloh in March 2015) as the source of the pressure.

56. CW3 confirmed that there was a lot of pressure from Defendants Hermiz and Dugan to improve financial performance – and not just on the plant Controllers. For example, CW3, the Head of Internal Audit, stated that he was under so much pressure and stress that he had to seek support from a therapist. Because of his negative experience at Shiloh, CW3 left the company in January 2015 despite being offered a 20% increase in salary to stay.

57. The accounting improprieties would be readily apparent to anyone who reviewed the Wellington facility's balance sheet or journal entries. CW1 stated that he noticed "abnormalities" in accounts related to the surcharge issue soon after he joined Shiloh around July 2013, and explained that as time went on, the erroneous accounting affected more and more entries, and that discrepancies just kept growing in number and magnitude. CW1 added that at

[5] Shiloh sells its metal scrap left over after production. However, for Shiloh, metal sold as scrap is worth less than metal used and sold in a product, so the existence of scrap eats into the Company's potential profit. Steel scrap prices also fluctuate with the price of steel, so volatility in the price of steel translates into dramatic volatility in Shiloh's profits. For example, Shiloh's net income for fiscal year 2015 was $8.2 million, after being negatively impacted by $8.9 million "due to the lower price recovered from engineered scrap sales."

least one account quadrupled over a seven month time period, and by 2015, the balance sheet was completely messed up. The accounting violations grew to such a level, that when they were finally corrected, CW1 stated that the correction completely “wiped out” all 2015 profit at the facility.

58. CW1 also explained that Defendants Hermiz and Dugan had access to information that documented the accounting manipulation that occurred at the Wellington facility. CW1 stated that journal entries and transactions were viewable by Shiloh management through the Company’s ERP system.

59. CW3 confirmed that Defendants Hermiz and Dugan had access to information that revealed the fraud at the Wellington Facility. CW3 stated that senior managers (Hermiz and Dugan) were well aware of the each individual plant’s performance, given that every quarter, each plant Controller produced a Power Point presentation that showed laid out, business operations, accounting treatment for any significant transactions, and trend analysis for assets and liabilities with information regarding variances, revenue, ***all inventory accounts***, and ***payables***. CW3 also indicated that there were monthly business reviews that Individual Defendants were privy to, and that around April 2014, weekly and daily meetings were instituted.

60. However, CW1 stated that as long as the Wellington facility was hitting its targets, Defendants Hermiz and Dugan ***did not want to ask any questions***.

61. Given these manipulations of the Company’s cost of sales, the Company reported financial results that were in violation of GAAP and the following principles:

(a) The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" (FASB Statement of Concepts No. 1, 34);

(b) The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events, and circumstances that change resources and claims to those resources" (FASB Statement of Concepts No. 1, 40);

(c) The principle that "financial reporting should provide information about an enterprise's financial performance during a period" (FASB Statement of Concepts No. 1, 42);

(d) The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" (FASB Statement of Concepts No. 1, 50);

(e) The principle that "financial reporting should be reliable in that it represents what it purports to represent" (FASB Statement of Concepts No. 2, 58-59);

(f) The principle that "completeness, meaning that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" (FASB Statement of Concepts No. 2, 79); and

(g) The principle that "conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" (FASB Statement of Concepts No. 2, 95).

62. The adverse information concealed by Defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## VII. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

63. During the Class Period, Shiloh filed periodic reports with the SEC, including Quarterly Reports on Form 10-Q and an Annual Report on Form 10-K, containing the Company's reported financial statements. Shiloh also Filed Current Reports of Form 8-K. Defendants Hermiz and Dugan signed every 10-Q and 10-K filed during the Class Period. The following chart identifies the date, and period covered by each report filed with the SEC during the Class Period:

| Form | Period | Date Filed | Referred to Below As |
|---|---|---|---|
| 8-K | 2014 Fiscal Year | 1/12/2015 | FY 2014 Form 8-K |
| 10-K | 2014 Fiscal Year | 1/13/2015 | FY 2014 Form 10-K |
| 8-K | 2014 Fiscal First Quarter | 3/9/2015 | Q1 2015 Form 8-K |
| 10-Q | 2014 Fiscal First Quarter | 3/11/2015 | Q1 2015 Form 10-Q |
| 8-K | 2014 Fiscal Second Quarter | 6/4/2015 | Q2 2015 Form 8-K |
| 10-Q | 2014 Fiscal Second Quarter | 6/5/2015 | Q2 2015 Form 10-Q |

64. As reflected by the below chart, during the Class Period, Shiloh issued the following press releases, which were attached to the Form 8-K's filed with the SEC by the Company. These press releases contained financial statements that were also included in the Company's quarterly and annual reports:

| Period | Date | Referred to Below As |
|---|---|---|
| 2014 Fiscal Year | 1/12/2015 | FY 2014 PR |
| 2015 Fiscal First Quarter | 3/9/2015 | Q1 2015 PR |
| 2015 Fiscal Second Quarter | 6/4/2015 | Q2 2015 PR |

65. All of Shiloh's financial statements/results issued during the Class Period, including those in the Company's FY 2014 Form 10-K, Q1 2015 Form 10-Q, and Q2 2015 Form 10-Q, as well as financial results that were derived from those financial statements, that were discussed in those SEC filings, and discussed in the Company's press releases, including the FY 2014 PR, Q1 2015 PR, and Q2 2015 PR were materially false and/or misleading because, as set forth herein, the financial statements failed to comply with SEC rules and GAAP as a result of the Company's misallocation of steel surcharges to inventory.

### A. Shiloh's Materially False or Misleading FY 2014 Financial Results and Financial Statements

66. As explained herein, Defendants knowingly, or with deliberate recklessness, understated the Company's cost of sales by misallocating costs associated with steel surcharges to the Company's inventory account rather than the Company's cost of sales account in violation of GAAP. As a result, the Company's gross margin and net income were overstated.

67. The Company's FY 2014 Form 10-K, FY 2014 Form 8-K, and FY 2014 PR in relevant part, announced the following financial results for FY 2014[6]:

| Cost of Sales | Gross Margin | Net Income |
|---|---|---|
| $799,143,000 | 9.1% | $22,444,000 |

68. These figures were materially false and/or misleading when made, or Defendants omitted to state material facts necessary to make the statements not misleading, with respect to Shiloh's manipulation of its cost of sales account because, as admitted by the Company in the Restatement, the adjustments made by the Company for the three-month period ended January 31, 2015, included amounts from fiscal 2014 "totaling [$982,000] pre-tax

[6] Note: gross margin was not reported in the FY 2014 PR, nor the FY 2014 8-K, but cost of sales and net income were reported.

primarily related to inventoried costs." In addition, CW1 stated that the Company had been manipulating its cost of sales account since he started in July 2013.

69. The materially false and misleading statements in the Company's FY 2014 Form 10-K, FY 2014 Form 8-K, and FY 2014 PR regarding Shiloh's cost of sales, gross margin, and net income were made with scienter because Defendants knew about or recklessly disregarded the improper accounting entries at the Wellington Facility. Specifically:

(a) As alleged in ¶54 and as detailed by CW2, Defendants set budgets that were "impossible" for the Wellington Controller to make;

(b) As alleged in ¶¶54-56 and as detailed by, CW2, and CW3, Defendants placed immense pressure on the Wellington Controller and other employees to hit their numbers;

(c) As alleged in ¶60 and as detailed by CW1, when the Wellington Controller performed the impossible by means of improper account manipulation, Defendants took a position of not asking any questions about how the feat was accomplished;

(d) As alleged in ¶57 and as detailed by CW1, the accounting manipulations at Wellington were readily apparent by the start of the Class Period. As described by CW1, as time went on, the accounting adjustments affected more and more entries, and the discrepancies kept growing in number and magnitude, with one account quadrupling over a seven-month time period. CW1 stated that the balance sheet was completely messed up by 2015;

(e) As alleged in ¶¶58-59 and as detailed by CW1 and CW3, Defendants had access to information that revealed the fraud at the Wellington facility through the

Company's ERP system, periodic business reviews, and quarterly Power Point presentations created by facility Controllers.

**B. Shiloh's Materially False or Misleading Q1 2015 Financial Reports and Financial Statements**

70. As explained herein, and as the Company admitted, Defendants knowingly, or with deliberate recklessness, understated the Company's cost of sales by misallocating costs associated with a surcharge on steel to the Company's inventory account rather than the Company's cost of sales account in violation of GAAP. As a result, the Company's gross margin and net income were overstated.

71. The Company's Q1 2015 Form 10-Q, Q1 2015 Form 8-K, and Q1 2015 PR in relevant part, announced the following financial results for Q1 2015[7]:

| **Cost of Sales** | **Gross Margin** | **Net Income** |
|---|---|---|
| $236,530,000 | 8% | $3,673,000 |

72. These figures were materially false and/or misleading when made, or Defendants omitted to state material facts necessary to make the statements not misleading, with respect to Shiloh's manipulation of its cost of sales account because the Company admitted that the figures were false, and adjusted them in the Restatement as follows:

| | **Cost of Sales** | **Gross Margin** | **Net Income** |
|---|---|---|---|
| **Initial Report** | $236,530,000 | 8.0% | $3,673,000 |
| **Adjustment** | $1,702,000 | (0.7%) | ($1,230,000) |
| **As Restated** | $238,232,000 | 7.3% | $2,443,000 |

73. The materially false and misleading statements in the Company's Q1 2015 Form 10-Q, Q1 2015 Form 8-K, and Q1 2015 PR regarding Shiloh's cost of sales, gross margin, and

[7] Note: gross margin was not reported in the Q1 2015 PR, nor the Q1 2015 8-K.

net income were made with scienter because Defendants knew about or recklessly disregarded the improper accounting entries at the Wellington Facility. Specifically:

(a) As alleged in ¶54 and as detailed by CW2, Defendants set budgets that were "impossible" for the Wellington Controller to make;

(b) As alleged in ¶¶54-56 and as detailed by, CW2, and CW3, Defendants placed immense pressure on the Wellington Controller and other employees to hit their numbers;

(c) As alleged in ¶60 and as detailed by CW1, when the Wellington Controller performed the impossible by means of improper account manipulation, Defendants took a position of not asking any questions about how the feat was accomplished;

(d) As alleged in ¶57 and as detailed by CW1, the accounting manipulations at Wellington were readily apparent by the start of the Class Period. As described by CW1, as time went on, the accounting adjustments affected more and more entries, and the discrepancies kept growing in number and magnitude, with one account quadrupling over a seven-month time period. CW1 stated that the balance sheet was completely messed up by 2015;

(e) As alleged in ¶58-59 and as detailed by CW1 and CW3, Defendants had access to information that revealed the fraud at the Wellington facility through the Company's ERP system, periodic business reviews, and quarterly Power Point presentations created by facility Controllers.

74. Additionally, these false statements mere made with scienter because the accounting manipulation caused net income to be overstated by more than 50% for Q1 2015.

Defendants were aware of the operations, accounting, and financial specifics of the Wellington manufacturing facility that accounted for such a significant percentage of the Company's net income, or Defendants were reckless in disregarding such information.

### C. Shiloh's Materially False or Misleading Q2 2015 Financial Results and Financial Statements

75. As discussed above, and as the Company admitted, Defendants knowingly, or with deliberate recklessness, understated the Company's cost of sales by misallocating costs associated with a surcharge on steel to the Company's inventory account rather than the Company's cost of sales account in violation of GAAP. As a result, the Company's gross margin and net income were overstated.

76. The Company's Q2 2015 Form 10-Q, Q2 2015 Form 8-K, and Q2 2015 PR in relevant part, announced the following financial results for Q2 2015:

| Cost of Sales | Gross Margin | Net Income |
|---|---|---|
| $251,127,000 | 10.4% | $7,195,000 |

77. These figures were materially false and/or misleading when made, or Defendants omitted to state material facts necessary to make the statements not misleading, with respect to Shiloh's manipulation of its cost of sales account because the Company admitted that the figures were false, and adjusted them in the Restatement as follows:

| | Cost of Sales | Gross Margin | Net Income |
|---|---|---|---|
| **Initial Report** | $251,127,000 | 10.4% | $7,195,000 |
| **Adjustment** | $1,093,000 | (0.4%) | ($842,000) |
| **As Restated** | $252,220,000 | 10.0% | $6,353,000 |

78. The materially false and misleading statements in the Company's Q2 2015 Form 10-Q, Q2 2015 Form 8-K, and Q2 2015 PR regarding Shiloh's cost of sales, gross margin, and net income were made with scienter because Defendants knew about or recklessly disregarded the improper accounting entries at the Wellington Facility. Specifically:

(a) As alleged in ¶54 and as detailed by CW2, Defendants set budgets that were "impossible" for the Wellington Controller to make;

(b) As alleged in ¶¶54-56 and as detailed by, CW2, and CW3, Defendants placed immense pressure on the Wellington Controller and other employees to hit their numbers;

(c) As alleged in ¶60 and as detailed by CW1, when the Wellington Controller performed the impossible by means of improper account manipulation, Defendants took a position of not asking any questions about how the feat was accomplished;

(d) As alleged in ¶57 and as detailed by CW1, the accounting manipulations at Wellington were readily apparent by the start of the Class Period. As described by CW1, as time went on, the accounting adjustments affected more and more entries, and the discrepancies kept growing in number and magnitude, with one account quadrupling over a seven-month time period. CW1 stated that the balance sheet was completely messed up by 2015;

(e) As alleged in ¶¶58-59 and as detailed by CW1 and CW3, Defendants had access to information that revealed the fraud at the Wellington facility through the Company's ERP system, periodic business reviews, and quarterly Power Point presentations created by facility Controllers.

79. Additionally, these false statements mere made with scienter because the accounting manipulation caused net income to be overstated by more than 13% for Q2 2015. Defendants were aware of the operations, accounting, and financial specifics of the Wellington manufacturing facility that accounted for such a significant percentage of the Company's net income, or Defendants were reckless in disregarding such information.

**D. Defendants' Materially False or Misleading Sarbanes-Oxley Certifications**

80. Shiloh's FY 2014 Form 10-K, Q1 2015 Form 10-Q, and Q2 2015 Form 10-Qs, contained Sarbanes-Oxley required certifications, signed by Defendants Hermiz and Dugan, who certified:

> 1. I have reviewed this [quarterly or annual] report on [Form 10-Q or 10-K] of Shiloh Industries, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. ***The registrant's other certifying officer and I*** are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and ***have***:
>
> > a) ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared***;
> >
> > b) ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our***

> ***supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statement for external purposes in accordance with generally accepted accounting principles***;
>
> c) ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation***; and
>
> d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and
>
> 5. ***The registrant's other certifying officer and I have disclosed***, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> b) ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***
>
> (Emphasis added.)

81. The statements contained in the above referenced certifications were materially false and/or misleading when made, or Defendants omitted to state material facts necessary to make the statements not misleading because, as admitted by the Company in the Restatement and its Current Report filed with the SEC on Form 8-K on September 14, 2015, "a material weakness existed in the Company's internal control over financial reporting at January 31, 2015 and April 30, 2015 as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934." The material weakness also existed during fiscal 2014 as evidenced by the Company's own

admission that adjustments made by the Company for the three-month period ended January 31, 2015, and the six month period ended April 30, 2015 included amounts from fiscal 2014 "totaling [$982,000] pre-tax primarily related to inventoried costs." In addition, CW1 stated that the Company had been manipulating its cost of sales account since he started at Shiloh in July 2013. Finally, the statements were false because the cost of sales were understated, net income was overstated, and gross margin was overstated in the FY 2014 Form 10-K, Q1 2015 Form 10-Q, and Q2 2015 Form 10-Q filed with their respective certifications.

82. The materially false and misleading statements in Individual Defendants' Sarbanes-Oxley certifications were made with scienter because Defendants knew about or recklessly disregarded the improper accounting entries at the Wellington Facility. Specifically:

(a) As alleged in ¶54 and as detailed by CW2, Defendants set budgets that were "impossible" for the Wellington Controller to make;

(b) As alleged in ¶¶54-56 and as detailed by, CW2, and CW3, Defendants placed immense pressure on the Wellington Controller and other employees to hit their numbers;

(c) As alleged in ¶60 and as detailed by CW1, when the Wellington Controller performed the impossible by means of improper account manipulation, Defendants took a position of not asking any questions about how the feat was accomplished;

(d) As alleged in ¶57 and as detailed by CW1, the accounting manipulations at Wellington were readily apparent by the start of the Class Period. As described by CW1, as time went on, the accounting adjustments affected more and more entries, and the discrepancies kept growing in number and magnitude, with one account quadrupling

over a seven-month time period. CW1 stated that the balance sheet was completely messed up by 2015;

(e) As alleged in ¶¶58-59 and as detailed by CW1 and CW3, Defendants had access to information that revealed the fraud at the Wellington facility through the Company's ERP system, periodic business reviews, and quarterly Power Point presentations created by facility Controllers.

83. Additionally, these false statements mere made with scienter because the accounting manipulation caused net income to be overstated by more than 13% for Q2 2015 and more than 50% in Q1 2015. Defendants were aware of the operations, accounting, and financial specifics of the Wellington manufacturing facility that accounted for such a large percentage of the Company's net income, or Defendants were reckless in disregarding such information.

## VIII. ADDITIONAL SCIENTER ALLEGATIONS

### A. The Magnitude of the Restatement Supports a Strong Inference of Scienter

84. Given the magnitude of the accounting error involved, and Defendant's access to the Wellington Facility's accounting data, Defendants knew, or were reckless in not knowing that the Wellington Facility was improperly accounting for costs associated with the surcharge on steel.

85. The exceptional performance of the Wellington plant in comparison and relation to the performance of Shiloh's other facilities was a red flag. The fraudulent accounting the Shiloh facility inflated the net income ***for the entire Company*** by more than 50% in Q1 2015, and by more than 13% in Q2 2015. In addition, the improper accounting inflated the gross margin for the entire Company by 0.7% and 0.4% for Q1 and Q2 2015, respectively.

86. Defendants also had knowledge of, and access to the information documenting the improper accounting entries at the Wellington facility. As stated by CW1, red flags associated with the improper accounting at the Wellington facility were readily apparent to the Individual Defendants through Shiloh's ERP system, which allowed them to view journal entry and transaction data. Individual Defendants had access to the relevant facility-specific information as pointed out by CW3, who stated that Defendants Hermiz and Dugan were well aware of each facility's financial performance, because every quarter, each plant controller produced a Power Point presentation that showed laid out, business operations, accounting treatment for any significant transactions, and trend analysis for assets and liabilities with information regarding variances, revenue, ***all inventory accounts***, and ***payables.*** In addition, CW4 stated that Defendants Hermiz and Dugan management style was hands-on, indicating that Individual Defendants were aware of the facility-specific financial data provided to them by the Wellington Controller.

87. Despite the presence of obvious red flags, access to the underlying financial information and accounting entries, and the ability to inquire as to how the Wellington facility was achieving exceptional results, CW1 stated that the Individual Defendants did not want to ask any questions, as long as the plant was hitting its numbers.

**B. Defendants' False Sarbanes-Oxley Certifications Support a Strong Inference of Scienter**

88. At all relevant times, Shiloh's failed to implement and maintain adequate internal controls over financial reporting. As Shiloh admitted in in the Restatement, the Company's disclosure controls and procedures were not effective. Specifically, Shiloh admitted that certain controls relating to "journal entries and account reconciliations" contained material weaknesses during the Class Period.

89. Hermiz and Dugan personally certified that they "[e]valuated the effectiveness of the registrant's disclosure controls and procedures" and "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting."

90. CW1 indicated that the accounting entries at Wellington were readily apparent. CW1 stated that he noticed the accounting abnormalities soon after joining Shiloh, that as time went on, the erroneous accounting affected more and more entries, and that discrepancies just kept growing in number and magnitude. CW1 also that at least one account quadrupled over a seven month time period, and by 2015, the balance sheet was ***completely messed up***. The accounting violations grew to such a level, that when they were finally corrected, CW1 stated that the correction completely "wiped out" all 2015 profit at the facility. The accounting violations were so egregious that, not only did their revelation wipe out the Wellington facility's profit for 2015, the fraud caused Shiloh's Company-wide Q1 2015 net income to be overstated by more 50%.

91. CW1 and CW3 also both stated that Defendants Hermiz and Dugan had access to information that documented the accounting manipulation that occurred at the Wellington facility. CW1 stated that journal entries and transactions were viewable by Shiloh management through the Company's ERP system. CW3 stated that managers (Hermiz and Dugan) were well aware of the each individual plant's performance, given that every quarter, each plant Controller produced a Power Point presentation that laid out business operations, accounting treatment for any significant transactions, and trend analysis for assets and liabilities with information regarding variances, revenue, ***all inventory accounts***, and ***payables***. CW3 also stated that there

were monthly business reviews and that around April 2014, weekly and daily meetings were instituted.

92. In the face of obvious red flags Defendants falsely certified that they had designed internal controls that provided reasonable assurance regarding the reliability of financial reporting, and evaluated the effectiveness of the Company's internal controls.

### C. Defendants' Attempt to Cover up the True Circumstances Surrounding the Restatement Supports a Strong Inference of Scienter

93. Defendants' false statements about how the improper accounting at the Wellington facility was discovered indicate that Individual Defendants knew, or recklessly disregarded the improper accounting activities.

94. Defendants claimed that they discovered the accounting fabrications at the Wellington plant because "[d]uring the third quarter of the 2015 fiscal year of Shiloh Industries, Inc., management implemented an enhanced balance sheet review process across all of the Company's 21 manufacturing facilities." Defendants claimed that "[i]n the course of implementing this new process, management encountered preliminary indications of accounting irregularities."

95. Defendants' version of events is belied by the accounts of former Shiloh employees. According to CW1, the Company was forced to disclose the accounting fraud at the Wellington facility when CW1 confronted the Group Controller that oversaw the Wellington facility. CW1 claims that ***only then*** did Defendants quickly commence an "investigation." Apparently, Defendants only addressed and disclosed the issue of the improper accounting at the Wellington facility after it was obvious the issue could not be silenced.

96. Not only did Defendants misleadingly claim that the fraud was discovered through an "enhanced review process," Defendants subsequently commended and promoted the

Corporate Controller who had disregarded the improper accounting entries. During the Company's third quarter 2015 conference call with investors and analysts on September 14, 2015, Defendant Hermiz stated: "I'm pleased with the Corporate Controller's team who discovered the issue, reported the issue to leadership immediately and corrected it in a timely manner." The same day, the Company announced that the Corporate Controller had been appointed Shiloh's "principle accounting officer." Defendants commended the Corporate Controller for "discovering" the accounting issues at the Wellington facility and promoted the Corporate Controller to "principle accounting officer" despite the fact that he had disregarded clear red flags and ongoing fraud at the Company's most significant facility.

### D. Defendants' Knowledge of Prior Accounting Errors and Their Efforts to Stymie Shiloh's Former Head of Internal Audit from Raising Accounting Issues Directly with the Board's Audit Committee Further Support a Strong Inference of Scienter

97. Prior to the revelation of the accounting manipulation at the Wellington facility, Defendants Hermiz and Dugan had recklessly disregarded other issues relating to the Company's accounting and proper application of GAAP.

98. CW3 recounted an instance when Defendants Hermiz and Dugan confronted CW3 about bringing an accounting issue to the attention of the Audit Committee. According to CW3, around December 2013 there had been a problem regarding fixed assets, and the Company had been trying to capitalize expenses improperly. CW3 investigated and received about 40 pages of documentation from plant managers, which CW3 turned over to the Audit Committee. Even though CW3 was permitted to provide this information to the Audit Committee (because CW3 reported to both the head of the Audit Committee and Defendant Dugan), CW3 was shortly thereafter pulled into a meeting with Defendants Hermiz and Dugan where, according to CW3,

Defendants Hermiz and Dugan made it perfectly clear that CW3 would have a problem if CW3 ever again went to the Audit Committee without first talking to Hermiz and Dugan.

99. The Individual Defendants disregarded of other potential errors in the Company's financial statements further supports a strong inference of scienter.

## IX. LOSS CAUSATION

100. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

101. During the Class Period, as a result of the open, well-developed, and efficient market for Shiloh's stock, the prices of Shiloh's stock fell when the misrepresentations alleged herein, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed to investors and the artificial inflation was removed over time from the price of Shiloh's stock. Defendants' wrongful conduct, alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs and the Class. Defendants' misrepresentations and omissions caused and maintained the artificial inflation in Shiloh's stock price throughout the Class Period until Defendants began to disclose the truth regarding the Company's financial condition to the market.

102. The truth regarding Shiloh's financial condition was revealed, and the concealed risks materialized, in part on September 9, 2015; and in part on September 14, 2015. As a direct result of these partial disclosures, the price of Shiloh's stock declined precipitously on heavy trading volume.

103. In July 2015, CW1 decided that the accounting violations occurring at the Wellington facility had to be corrected, and took the issue to the Group Controller. Soon thereafter, as management realized the fraud could no longer be kept under wraps, the

Wellington Controller and the Group Controller resigned and the Company commenced an "investigation" into the matter.

104. On September 9, 2015, Shiloh filed a Notice of Late Filing with the SEC disclosing that the Company was unable to timely file its Quarterly Report for the quarter ended July 31, 2015 because of an ongoing internal investigation into the accounting for certain costs at the Company's facility in Wellington, Ohio, related to a surcharge assessed on steel, and that effective September 8, 2015, Defendant Dugan was no longer the Company's principal accounting officer. The Company also estimated that the effect on its net income of the accounting issue could be as high as $2.5 million. In the Notice, the Company, in relevant part, stated:

> **Item 4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**
>
> During the third quarter of the Company's 2015 fiscal year, as part of a newly implemented enhanced balance sheet review process encompassing all of the Company's 21 manufacturing facilities, ***management encountered preliminary indications of a potential issue with respect to the accounting for inventoried costs*** and promptly notified the Audit Committee of the Company's Board of Directors (the "Audit Committee") and the Company's external auditor. After receiving this information from management, the Audit Committee commenced a formal investigation to assess the nature and extent of any misstatements, and their potential effect on previously issued financial statements and management's internal control over financial reporting. The Audit Committee retained independent third-party advisors to assist with this investigation. Although this investigation is ongoing and no final determination has been made as of the date hereof, based on its investigation to date, (i) ***the Company believes that the majority of this issue is associated with a surcharge assessed on steel at the Company's facility in Wellington, Ohio***, and (ii) ***the Company expects that the aggregate impact on Company's net income will be in the range of $2.2 million to $2.5 million***.
>
> Due to the ongoing investigation described above, the Company is unable to file the Quarterly Report by the prescribed September 9, 2015 deadline without undue effort and expense. The Company is working toward filing the Quarterly Report as soon as practicable.

> **Item 5.02 Departure of Directors or Certain Officers; Election of Directors; Appointment of Certain Officers; Compensatory Arrangements of Certain Officers.**
>
> * * *
>
> Effective September 8, 2015, Thomas Dugan, Vice President Finance and Treasurer, who previously served as principal financial officer and principal accounting officer of the Company, will continue to serve as the Company's principal financial officer.

(Emphasis added.)

105. On this news, the Company's stock price fell $2.37 per share, or 21.5%, over two days to close at $8.62 per share on September 11, 2015.

106. On September 14, 2015, Shiloh filed a Current Report with the SEC of Form 8-K. Therein, the Company confirmed that it had understated the cost of sales associated with a surcharge assessed on steel at the Company's Wellington facility, and that "previously reported consolidated cost of sales for the three-month periods ended January 31, 2015 and April 30, 2015 are understated by approximately $1.7 million and $1.1 million, respectively, resulting in cumulative overstatements of reported gross profit of $1.9 million and $1.3 million, respectively, and net income of approximately $1.2 million and $0.8 million, respectively." The Company also stated that it was restating its Q1 205 and Q2 2015 Quarterly Reports, and that, as such, its prior reports for those periods should no longer be relied upon. In relevant part, the Company stated:

> During the third quarter of the 2015 fiscal year of Shiloh Industries, Inc. (the "Company"), management implemented an enhanced balance sheet review process across all of the Company's 21 manufacturing facilities. In the course of implementing this new process, management encountered preliminary indications of accounting irregularities with respect to the accounting for inventoried costs, the majority of which was associated with a surcharge assessed on steel at the Company's facility in Wellington, Ohio. As a result, management promptly notified the Audit Committee and the Company's independent registered public accounting firm. After receiving this information from management, the Audit

Committee commenced a formal investigation to assess the nature and extent of any misstatements, and their potential effect on previously issued financial statements and management's assessment of internal control over financial reporting. The Company, at the direction of the Audit Committee, retained independent third-party advisors to assist with this investigation.

The investigation by the Audit Committee, with the assistance of management and independent third-party advisors, determined that an employee with functional responsibilities at the Company's Wellington facility had circumvented certain internal controls resulting in an understatement of the cost of sales related to inventoried costs, the majority of which was associated with a surcharge assessed on steel at the Company's Wellington facility. The enhanced balance sheet review process included an examination of selected accounts at the Company's other facilities. No other misstatements were discovered during this review process.

Based on the results of its investigation into these misstatements, the Audit Committee with the assistance of management and independent third-party advisors determined that previously reported consolidated cost of sales for the three-month periods ended January 31, 2015 and April 30, 2015 are understated by approximately $1.7 million and $1.1 million, respectively, resulting in cumulative overstatements of reported gross profit of $1.9 million and $1.3 million, respectively, and net income of approximately $1.2 million and $0.8 million, respectively.

On September 11, 2015, after analyzing these misstatements and consulting with management and independent third-party advisors involved in the investigation, the Audit Committee concluded that the financial statements for the three-month periods ended January 31, 2015 and the three- and six-month periods ended April 30, 2015 should be restated and therefore should no longer be relied upon. The Audit Committee discussed the restatement with its independent registered public accounting firm.

The financial statements for the three-month period ended January 31, 2015 and three-month and six-month periods ended April 30, 2015 were included in the Company's Quarterly Reports on Form 10-Q filed on March 11, 2015 and June 5, 2015, respectively. The Company will amend both Quarterly Reports on Form 10-Q in order to correct the misstatements and related disclosures on September 14, 2015.

The Company's internal control over financial reporting may not prevent or detect misstatements because of inherent limitations, including the possibility of human error, the circumvention or overriding of controls, or fraud; effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements. To that end, the Company concluded that certain controls relating to journal entries and account reconciliations were

> circumvented by an employee with functional responsibilities at the Wellington manufacturing plant. In light of these circumstances, the Company has determined that a material weakness existed in the Company's internal control over financial reporting at January 31, 2015 and April 30, 2015 as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934. The Company has taken additional remediation steps, including replacing the financial leader at the Company's Wellington facility, continuing to evaluate additional organizational changes, reassigning detailed reconciliations of interrelated accounts to trusted, experienced employees from both corporate and plant personnel, implementing new internal reporting procedures, retraining employees in key internal control measures, utilizing subject matter experts across different facilities and enhancing management oversight over the Company's Wellington facility until remediation is completed. The Company continues to evaluate whether any additional remediation measures are necessary.

107. On the same day, September 14, 2015, the Company filed the Restatement. Therein, the Company disclosed that the restatements included amounts from fiscal year 2014. Note 16 to the Restatement read:

> **Restatement of Previously Issued Financial Statements**
>
> As disclosed in the Company's Current Report on Form 8-K, filed on September 14, 2015, the Company, after an investigation by the Audit Committee, with the assistance of management and independent third-party advisors, concluded that previously issued condensed consolidated financial statements should not be relied upon due to errors related to the understatement of consolidated cost of sales . . . . The Audit Committee's decision to restate the condensed consolidated financial statements was based upon the results of an investigation of accounting for inventoried costs at the Company's Wellington facility. The Company has restated its condensed consolidated financial statements for [the period covered by this quarterly report] and such statements are included in this Amended Filing.
>
> During the Company's investigation, other correcting entries specific to the Wellington facility were identified and corrected, including certain amounts such as prepaid accounts that should have been expensed during the periods. ***The adjustments for*** [the period covered by this quarterly report] ***included certain immaterial amounts from fiscal 2014 totaling*** [$982,000] ***pre-tax primarily related to inventoried costs.*** Further, the tax impact of all adjustments has been recorded.

(Emphasis added.)

108. The Restatement included adjustments to the Company's cost of sales, gross margin, and net income for Q1 2015 and Q2 2015. The relevant adjustments were as follws:

| **Q1 2015** | **Cost of Sales** | **Gross Margin** | **Net Income** |
|---|---|---|---|
| **Initial Report** | $236,530,000 | 8.0% | $3,673,000 |
| **Adjustment** | $1,702,000 | (0.7%) | ($1,230,000) |
| **As Restated** | $238,232,000 | 7.3% | $2,443,000 |

| **Q2 2015** | **Cost of Sales** | **Gross Margin** | **Net Income** |
|---|---|---|---|
| **Initial Report** | $251,127,000 | 10.4% | $7,195,000 |
| **Adjustment** | $1,093,000 | (0.4%) | ($842,000) |
| **As Restated** | $252,220,000 | 10.0% | $6,353,000 |

109. Notably, the net income adjustment for Q1 2015, from $3,673,000 down to $2,443,000, represents an overstatement of **50.3%**, and the Q2 2015 net income adjustment from $7,195,000 down to $6252, represents an overstatement of **13.2%**.

110. With respect to the Company's internal controls, the Restatement confirmed the existence of material weaknesses during Q1 and Q2 2015:

> The Company's PEO and PFO concluded that the Company's disclosure controls and procedures were not effective as of [January 31, 2015 and April 30, 2015] due to the material weakness described below.
>
> * * *
>
> Management's review of its control procedures concluded that certain controls relating to journal entries and account reconciliations were circumvented by an employee with functional responsibilities at the Wellington manufacturing plant.
>
> * * *
>
> To remediate the material weakness described above and enhance the Company's internal controls over financial reporting, management has implemented the changes which include the following:
>
> - Replaced the financial leader at the Wellington plant, and determined to continue to evaluate additional organizational changes.

- Detailed reconciliations of interrelated accounts have been reassigned to trusted, experienced employees from both corporate and plant personnel.

- Implemented additional internal reporting procedures, including those designed to add depth to the Company's review processes and improve its segregation of duties.

- Retraining and reinforcement of key internal controls continued, and is expected to continue, through the Company's management activities, as well as utilizing of subject matter experts across different facilities. Experienced employees from sister facilities have been temporarily assigned to Wellington, while internal audit reevaluates and reinforces the identified key controls in effect.

- Increased management oversight, including additional detailed balance sheet review and journal entry approval, until all remediation is completed.

> The Company is committed to maintaining a strong internal control environment and believes these remediation efforts will represent significant improvement in controls. The Company has started to implement these steps, acknowledging some steps will take time to be fully integrated and confirmed to be effective and sustainable. While considerable actions have been taken to improve the Company's internal controls in response to the material weakness described above, additional work continues. There were no other changes to the Company's internal control over financial reporting that occurred during the first quarter of fiscal 2015 that have materially affected, or are reasonably likely to materially affect, the Company's internal control over financial reporting.

111. On this news, the Company's stock price fell $1.68, or 16.3%, to close at $8.58 per share on September 15, 2015.

## X. <u>CLASS ACTION ALLEGATIONS</u>

112. Plaintiffs brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased Shiloh's securities between January 12, 2015, and September 14, 2015, inclusive (the "Class Period") and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have

or had a controlling interest.

113. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Shiloh's securities were actively traded on the Nasdaq Stock Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Shiloh shares were traded publicly during the Class Period on the NASDAQ. As of June 4, 2015, Shiloh had 17,249,355 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Shiloh or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

114. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

115. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

116. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Shiloh; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

117. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. UNDISCLOSED ADVERSE FACTS

118. The market for Shiloh's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, Shiloh's securities traded at artificially inflated prices during the Class Period. Plaintiffs and other members of the Class purchased or otherwise acquired Shiloh's securities relying upon the integrity of the market price of the Company's securities and market information relating to Shiloh, and have been damaged thereby.

119. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Shiloh's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or

misrepresented the truth about Shiloh's business, operations, and prospects as alleged herein.

120. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Shiloh's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## XII. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

121. The market for Shiloh's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Shiloh's securities traded at artificially inflated prices during the Class Period. On March 18, 2015, the Company's stock closed at a Class Period high of $14.56 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Shiloh's securities and market information relating to Shiloh, and have been damaged thereby.

122. During the Class Period, the artificial inflation of Shiloh's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Shiloh's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Shiloh and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

123. At all relevant times, the market for Shiloh's securities was an efficient market for the following reasons, among others:

(a) Shiloh stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Shiloh filed periodic public reports with the SEC and/or the NASDAQ;

(c) Shiloh regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Shiloh was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

124. As a result of the foregoing, the market for Shiloh's securities promptly digested current information regarding Shiloh from all publicly available sources and reflected such information in Shiloh's stock price. Under these circumstances, all purchasers of Shiloh's securities during the Class Period suffered similar injury through their purchase of Shiloh's securities at artificially inflated prices and a presumption of reliance applies.

## XIII. NO SAFE HARBOR

125. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Shiloh who knew that the statement was false when made.

## XIV. COUNTS

### FIRST CLAIM
### Violation of Section 10(b) of The Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

126. Plaintiffs repeat and reallege each and every allegation contained above as if fully

set forth herein.

127. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Shiloh's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

128. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Shiloh's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

129. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Shiloh's financial well-being and prospects, as specified herein.

130. These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Shiloh's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state

material facts necessary in order to make the statements made about Shiloh and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

131. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

132. The defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Shiloh's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated

by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

133. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Shiloh's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Shiloh's securities during the Class Period at artificially high prices and were damaged thereby.

134. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Shiloh was experiencing, which were not disclosed by Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Shiloh securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

135. By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

136. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

137. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

138. The Individual Defendants acted as controlling persons of Shiloh within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

139. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to

control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

140. As set forth above, Shiloh and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## XV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b) Awarding compensatory damages in favor of Plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XVI. JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: February 16, 2016

**GLANCY PRONGAY & MURRAY LLP**

By: *s/ Robert V. Prongay*
Lionel Z. Glancy
Robert V. Prongay
Casey E. Sadler
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

-and-

**GLANCY PRONGAY & MURRAY LLP**
Lesley F. Portnoy (LP-1941)
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone: (212) 682-5340
Facsimile: (212) 884-0988
lportnoy@glancylaw.com

**THE ROSEN LAW FIRM, P.A.**
Laurence Rosen
Phillip Kim
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827

*Attorneys for Plaintiffs and the Class*

**PROOF OF SERVICE BY ELECTRONIC POSTING PURSUANT TO SOUTHERN DISTRICT OF NEW YORK ECF AND LOCAL RULES AND BY MAIL ON ALL KNOWN NON-REGISTERED PARTIES**

I, the undersigned say:

I am not a party to the above case, and am over eighteen years old.

On February 16, 2016, I served true and correct copies of **AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**, by posting the documents electronically to the ECF website of the United States District Court for the Southern District of New York, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed this 16th day of February, 2016, at Los Angeles, California.

*s/ Robert V. Prongay*
Robert V. Prongay

# Mailing Information for a Case 1:15-cv-07449-KMW

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Sara Esther Fuks**
  sfuks@rosenlegal.com
- **Phillip C. Kim**
  pkim@rosenlegal.com
- **Robert C. Micheletto**
  rmicheletto@jonesday.com,dpjacobson@jonesday.com
- **Lesley Frank Portnoy**
  LPortnoy@glancylaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,echang@glancylaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)