UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RAYMOND THOMAS and WILLIAM PORTER, individually and on behalf of all others similarly situated,

              Plaintiffs,

v.

SHILOH INDUSTRIES, INC., RAMZI HERMIZ, and THOMAS M. DUGAN,

              Defendants.

15-cv-7449 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

    Lead Plaintiff Raymond Thomas and Plaintiff William Porter ("Plaintiffs") bring this putative class action against Shiloh Industries ("Shiloh") and two of its individual directors, Ramzi Hermiz and Thomas M. Dugan ("Individual Defendants"; collectively, "Defendants").

    Plaintiffs assert claims under Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934 (the "Exchange Act"), and Section 20(a) of the Exchange Act. Corrected Amended Complaint ("CAC") ¶¶ 126−36, 137−140. Plaintiffs allege that Defendants perpetrated an accounting fraud at Shiloh's manufacturing facility in Wellington, Ohio. Plaintiffs contend that as a result, this fraudulent accounting artificially inflated Shiloh's net income. After management was alerted to potential accounting misconduct, Shiloh launched an internal investigation. Subsequently, in late 2015, Shiloh issued a restatement of its financial results for the first two fiscal quarters of 2015, caused by this accounting discrepancy at the Wellington facility. Plaintiffs allege that when this purported fraud was revealed, Shiloh's stock price plummeted.

    Defendants have moved to dismiss the CAC under Rule 9(b) of the Federal Rules of Civil

1

Procedure and the Private Securities Litigation Reform Act ("PSLRA"). For the reasons stated below, because Plaintiffs fail to state with particularity facts giving rise to scienter, Defendants' motion is GRANTED in its entirety.

## I. BACKGROUND

The facts stated here, alleged in the Corrected Amended Complaint, are assumed to be true for the purpose of this motion. *See, e.g.*, *Witt v. Vill. of Mamaroneck, N.Y.*, 639 F. App'x 44, 45 (2d Cir. 2016). Plaintiffs represent a class of all purchasers of Shiloh securities between January 12, 2015, and September 14, 2015 (the "Class Period"), who are seeking remedies under the Exchange Act. CAC ¶ 1. Defendant Shiloh, incorporated in Delaware with its principal offices located in Ohio, is a supplier of lightweighting equipment to various automotive and commercial vehicle industries. *Id.* ¶ 35. Lightweighting enables manufacturers to build vehicles in a more cost and weight efficient manner. Shiloh also provides noise, vibration, and harshness solutions to manufacturers. *Id.* Shiloh maintains twenty-one manufacturing facilities, and is headquartered in Valley City, Ohio. *Id.* ¶ 15.

Shiloh's securities are actively traded on the NASDAQ Global Market. *Id.* ¶ 113. Defendant Ramzi Hermiz has been President and CEO of Shiloh since 2012. Defendant Thomas Dugan was Vice President of Finance and Treasurer "at all relevant times." *Id.* ¶ 29.

### A. Allegations in the Complaint

Plaintiffs allege that Defendants intentionally perpetrated the fraud of which Plaintiffs complain. *Id.* ¶ 6. They claim that Defendants effected this alleged fraud by allowing misallocated steel surcharges on the balance sheet to remain uncorrected, which had the effect of understating the cost of goods sold and inflating inventory. *Id.* ¶ 7−8. Plaintiffs further allege that Defendants touted their financial success to investors for the first and second quarters of 2015,

*id.* ¶ 9, but that on September 9, 2015, Shiloh revealed that it was conducting an internal investigation into the accounting at its Wellington facility. *Id.* ¶ 10. Specifically, Shiloh indicated that there was a potential issue regarding accounting for inventoried costs. *Id.* ¶ 16. Plaintiffs claim that this disclosure, as well as the Company's report to the SEC amending its financial results for the fiscal year 2014 and the first and second quarters of 2015, caused Shiloh's stock price to fall. *Id.* ¶¶ 11–14. The amended report, called the Restatement, "confirmed that the Company understated cost of sales, overstated gross margin, and overstated net income for Q1 2015 and Q2 2015." *Id.* ¶ 13.

Plaintiffs seek compensatory damages for the injuries sustained as a result of Defendants' alleged wrongdoing. *Id.* p. 50.

## II. LEGAL STANDARD

### A. Rule 9b and PSLRA

To survive a motion to dismiss a complaint alleging securities fraud, the complaint must satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure and the PSLRA.

A complaint alleging fraud "must state with particularity the circumstances constituting fraud," or otherwise face dismissal. Fed. R. Civ. P. 9(b). *See also Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 168 (2d Cir. 2000); *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 267 (2d Cir. 1996). Rule 9(b) also allows that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," but per the PSLRA, the plaintiff must also allege facts that support a strong inference of fraudulent intent. 15 U.S.C. § 78u-4(b)(2); *Ganino*, 228 F.3d at 169; *Acito v. FMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).

### B. *Rule 10b-5 and Section 10(b)*

To state a claim for securities fraud under section 10(b) and Rule 10b-5, Plaintiffs must allege (1) a material misrepresentation or omission; (2) scienter; (3) connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *In re China Mobile Games & Entm't Grp., Ltd. Sec. Litig.*, 2016 WL 922711, *3 (Mar. 7, 2016) (Wood, J.).

## III. DISCUSSION

Plaintiffs' claims arise from the series of accounting misstatements that took place at Shiloh's Wellington facility. Defendants do not dispute that these misstatements occurred. Defendants informed investors in September of 2015 that an ongoing internal investigation would prevent Shiloh from timely filing its quarterly financial statements to the SEC, as required. Defendants admit that the misstatements on the balance sheet reflected an understatement of the cost of sales by $1.7 million in the first fiscal quarter of 2015 and $1.1 million in the second quarter, which overstated the company's net income by $1.2 million in the first quarter and $800,000 in the second quarter. Defs.' Mot. to Dismiss at 3 (Doc. 31) ["MTD"].

However, the crux of the present dispute is whether Plaintiffs have sufficiently alleged that Defendants, both Shiloh and Individual Defendants, acted with scienter in perpetrating these fraudulent misstatements. Because Plaintiffs fail to plead any facts that either show that Defendants had the motive and opportunity to commit fraud, or that constitute strong circumstantial evidence of recklessness, *Ganino*, 228 F.3d at 168–69, this Court GRANTS Defendants' Motion to Dismiss.

### A. *Scienter*

The PSLRA established a stringent pleading requirement for a Complaint to sufficiently allege that a defendant acted with scienter. The Supreme Court's decision in *Tellabs* requires that

4

a district court, in evaluating a motion to dismiss a complaint on scienter grounds, "must take into account plausible opposing inferences," and not decide "[t]he strength of an inference … in a vacuum." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007). "[T]he requisite strong inference of scienter is present 'if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *In re Lehman Bros. Sec. & ERISA Litig.*, 903 F. Supp. 2d 152, 185 (S.D.N.Y. 2012) (Kaplan, J.) (quoting *Tellabs*, 551 U.S. at 324) (emphasis omitted).

To sufficiently plead scienter, a Rule 10b-5 action requires the complaint to show "an intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12 (1976). In the Second Circuit, this can be shown in two ways: first, by alleging facts that show defendants had both the motive and opportunity to commit fraud, or alternatively, by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Ganino*, 228 F.3d 154, 168–69 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)); *see Acito,* 47 F.3d at 52; *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 268–69 (2d Cir. 1993).

### 1. Motive & Opportunity

For Plaintiffs to successfully plead motive and opportunity, they must allege facts demonstrating that the defendant "benefitted in some concrete and personal way from the purported fraud." *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir. 2000). A generalized motive to maintain corporate profitability, or to keep stock prices high, is not sufficiently concrete for purposes of inferring scienter. *Chill*, 101 F.3d at 268. Rather, a misrepresentation in order to keep the stock prices artificially high, while corporate insiders sold their shares and made a profit, for example, would amount to a concrete benefit. *Id.*; *Novak*, 216 F.3d at 308.

Here, Plaintiffs acknowledge that they do not allege a motive to commit fraud, or a concrete benefit, and state correctly that they are not required to do so. Pls.' Opp'n to Defs.' Mot. to Dismiss at 11 n.17 (Doc. 36) ["Opp'n"].

### 2. Recklessness

Alternatively, a plaintiff unable to show scienter through an allegation of motive and opportunity can otherwise "raise a strong inference of scienter" by demonstrating persuasive circumstantial evidence of conscious misbehavior or recklessness, "though the strength of the circumstantial allegations must be correspondingly greater if there is no motive." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001).

In this context, the Second Circuit defines recklessness as conduct so highly unreasonable that it constitutes "an extreme departure from the standards of ordinary care," such that "the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Rothman*, 220 F.3d at 90; *see also Novak*, 216 F. 3d at 308; *Chill*, 101 F.3d at 269 ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness."); *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 581 (S.D.N.Y. 2014) (Forrest, J.), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

Plaintiffs' theory of scienter centers on Defendants' access to the fraudulent accounting statements at its Wellington facility; Defendants were allegedly aware of or recklessly disregarded signals that the facility's balance sheet was inaccurate due to improper accounting. *E.g.*, CAC ¶¶ 18, 30, 58−59; Opp'n at 8−9. Plaintiffs contend that the employee who actually misallocated the steel surcharges was under immense pressure to hit impossible targets, and Defendants purportedly chose not to ask questions probing into the numbers as long as the facility was meeting its objectives. CAC ¶¶ 17, 52−56, 69.

Despite their efforts to urge this Court to view scienter "holistically," as a sum of several insufficient allegations, *see* Opp'n at 6, Plaintiffs fail to proffer a single adequate claim establishing a compelling inference of scienter. *Tellabs*, 551 U.S. at 314. Plaintiffs submit that the contrary, contending that their allegations of scienter are at least as compelling as any opposing inference. Opp'n at 6. Not one of Plaintiffs' theories represents evidence showing Defendants' actual knowledge of the accounting statements; an "extreme departure from the standards of ordinary care;" or a danger so obvious that Defendants must have been aware. *See Rothman*, 220 F.3d at 90. This Court will evaluate each of Plaintiffs' theories of scienter in tandem.

### a. Magnitude of Fraud

Plaintiffs allege that the magnitude of the accounting error was so significant, that Defendants were reckless in not deeming the exceptional performance at the Wellington facility to be suspicious. CAC ¶ 15.

Plaintiffs allege that significant violations occurred under the Generally Accepted Accounting Principles ("GAAP"), as steel surcharges were misallocated in a way that inflated Shiloh's reported gross margin and net income. *Id.* ¶ 7. The improper accounting had the following effects: as the Company disclosed in its Restatement, after investigating the fraud, net income was cumulatively overstated by approximately $1.2 million in Q1 2015 (50%) and $800,000 in Q2 2015 (13%). Defendants note that accounting discrepancies often have an exaggerated effect on net income, and therefore net income is an inappropriate gauge of the magnitude of an accounting error. Defs.' Reply in Supp. of Mot. to Dismiss at 4 (Doc. 37) ["Reply"]. Instead, the appropriate measure of a failure to "allocate appropriate amounts to the cost of sales account," CAC ¶ 7, is the error's overall impact on the cost of sales. Reply at 5.

7

Accordingly, the cost of sales was understated by 0.7% in the first quarter of 2015 and 0.4% in the second quarter. *Id.*; CAC ¶ 85.

Although "[a]llegations of failure to comply with GAAP do not suffice to allege scienter," Plaintiffs argue that significant GAAP violations can provide "powerful indirect evidence of scienter." *Plumbers & Pipefitters Local Union No. 719 Pension Trust Fund v. Conseco Inc.*, 2011 WL 1198712, at *22 (S.D.N.Y. Mar. 30, 2011) (Koeltl, J.) [hereinafter "*Conseco*"]; Opp'n at 16 (quoting *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F. Supp. 2d 1248, 1273 (N.D. Cal. 2000)). But the significance of the GAAP violations was minor here.

The decision Plaintiffs cite for the proposition that GAAP violations can suggest scienter guides courts to distinguish between minor and significant violations. *In re McKesson*, 126 F. Supp. 2d at 1273. Here, where the overall effect of the improper accounting on the company's financial results was modest, an attribution of scienter is less plausible. *In re Magnum Hunter Res. Corp. Sec. Litig.*, 26 F. Supp. 3d 278, 295 (S.D.N.Y. 2014) (Forrest, J.), *aff'd*, 616 F. App'x 442 (2d Cir. 2015).

The CAC also states that the Wellington facility was Shiloh's supposed "crown jewel," making the overstatement of the gross margin and net income so obvious that it was reckless to not catch the accounting fraud. Plaintiffs argue that a fraud involving a company's core operations may support an inference of scienter. Opp'n at 14.

Courts applying the core operations doctrine generally "require[] that the operation in question constitute nearly all of a company's business before finding scienter." *Hensley v. IEC Elecs. Corp.*, 2014 WL 4473373, at *5 (S.D.N.Y. Sept. 11, 2014) (Furman, J.) (quoting *Tyler v. Liz Claiborne, Inc.,* 814 F. Supp. 2d 323, 343 (S.D.N.Y. 2011) (Holwell, J.)). Given that the Wellington facility is only *one* of Shiloh's 21 facilities, and the accounting issues were not all-

8

encompassing, the core operations argument is unavailable here.

When pressed to point out any incident, statement, or event which would have alerted Defendants to the unusually positive performance, Plaintiffs highlight quarterly PowerPoint presentations that laid out financial data for each facility. CAC ¶ 85; Opp'n at 8. Plaintiffs claim that the PowerPoint presentations made the accounting errors at Wellington "so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308. Various confidential witnesses also attest that Individual Defendants were aware of "atypically high gross margins and all-around exceptional performance relative to the rest of the Company's plants." Opp'n at 9. Plaintiffs argue that Defendants "roundly rejected" reviewing the data in question. *Id.* at 11. These allegations, however, are conclusory, and fail to demonstrate that Defendants "made misleading public statements despite knowledge" of the true accounting levels at Wellington. *Hensley*, 2014 WL 4473373, at *6.

### b. *Sarbanes-Oxley Certifications*

Plaintiffs maintain that Defendants offered false certifications as part of their required submissions under the Sarbanes-Oxley Act. Individual Defendants signed the certifications, which attest that the company had adequate internal controls over financial reporting. CAC ¶ 80. Plaintiffs imply that this was a lie, based on contrary allegations from the confidential witnesses. *Id.* ¶ 82. Plaintiffs argue that these false certifications demonstrate scienter.

This argument fails for the same reasons as stated *supra*. Conclusory statements that Defendants "consciously turned a blind eye" to problems with the company's internal controls for financial reporting, absent any concrete, compelling evidence to support the allegation, do not suffice to show scienter. "A failure 'to identify problems with the defendant-company's internal controls and accounting practices does not constitute reckless conduct sufficient for § 10(b)

9

liability.'" *Conseco,* 2011 WL 1198712, at *22 (quoting *Novak*, 216 F.3d at 309).

### c. Cover-Up

Plaintiffs further assert that Defendants commenced an internal investigation as a sham procedure to cover up the fraudulent accounting. They claim that Defendants crafted the story that a rogue employee was responsible for the mistaken accounting at the Wellington facility in order to cover up their complicity with the fraud, and that the investigation commenced only after the fraud could no longer be concealed.

The evidence to support this theory comes from a confidential witness, who claims to have alerted the Group Controller to the accounting issue. CAC ¶ 95. The Group Controller is not one of the Individual Defendants. In their Opposition to the Motion to Dismiss, Plaintiffs also submit that the Group Controller's subsequent resignation, and Defendants' failure to publicly disclose the resignation, was a deliberate attempt to conceal Individual Defendants' role in the fraud. Opp'n at 12.

Defendants admitted in their Restatement that there was "a material weakness in the Company's internal control over financial reporting," and once that was discovered, the Company commenced an internal investigation into the matter. CAC ¶ 81 (Form 8-K, filed Sept. 14, 2015 (Doc. No. 33-3)). Similar to the facts in *Higginbotham v. Baxter Int'l, Inc.*, Shiloh "learned enough to lead a reasonable person to conduct an investigation." 495 F.3d 753, 758 (7th Cir. 2007). Defendants' conduct "demonstrat[es] a pursuit of truth rather than reckless indifference to the truth," as discovering facts that instigate an investigation "is a very great distance from convincing proof of intent to deceive." *Id.*

Accounting for "plausible opposing inferences" of scienter, as the Supreme Court guides in *Tellabs*, this Court finds that Plaintiffs fail to allege facts that tell a cogent and compelling

story as to why the internal investigation was a cover-up, rather than a responsible effort to identify and eliminate issues with the company's internal controls. 551 U.S. at 323. There is no "fraud by hindsight," and such an allegation will not hold, here. *Id.* at 320.

### d. Individual Defendants

Plaintiffs wage a host of allegations against Individual Defendants; none provides a compelling inference of recklessness. Because Hermiz and Dugan assumed roles of influence within the company, Plaintiffs theorize, they had the authority to control Shiloh's SEC disclosures. CAC ¶ 30. With access to private information about the Company's finances, Plaintiffs allege that the Individual Defendants "knew that the adverse facts … were being concealed from the public." ¶ 30.

The furthest the CAC goes in showing that Individual Defendants either actually knew of the accounting mishaps at Wellington, or that there were red flags that Defendants recklessly ignored, is the assertion from a confidential witness that senior managers were given PowerPoint presentations with data from inventory accounts. As discussed, *supra*, a PowerPoint presentation alone does not make the incorrect accounting data "so obvious that [Defendants] must have been aware of it." *In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 547 (S.D.N.Y. 2009) (Sullivan, J.).

The CAC contains several allegations from confidential witnesses, including an encounter between the third confidential witness ("CW3") and Defendants Hermiz and Dugan. In this instance, Individual Defendants allegedly chastised CW3 for *not* reporting a fixed assets accounting error in a particular chain of command—to Hermiz and Dugan, first.

The CAC and Motion to Dismiss tell different stories about that encounter. *E.g.*, MTD at 18; CAC ¶ 19. In the CAC, CW3 never claims that he reported accounting errors to the

Individual Defendants, who then deliberately ignored those reports. He never claims he was prevented from reporting similar issues after this encounter. The allegation of an alleged confrontation over a reporting hierarchy fails to raise a compelling inference of scienter.

The first confidential witness ("CW1") states that he noticed abnormalities in the balance sheet at the Wellington facility, and he notes that Individual Defendants had access to this material, yet chose not to ask questions about the Wellington facility's numbers. CAC ¶¶ 57–58, 87. According to the CAC, CW1 was the employee who brought the accounting issues to the Group Controller's attention; this prompted an internal investigation. *Id.* ¶ 31. Similar to CW3, CW1's claim falters for the same reason: none of the confidential witnesses asserts that the Individual Defendants had personal knowledge of the accounting discrepancies at issue. MTD at 20 (quoting *In re Magnum Hunter Res.*, 26 F. Supp. 3d at 285). And, as discussed *supra*, mere access to data is not a stand-in for recklessness.

### B.   *Nonculpable Explanations*

Several insufficient allegations of recklessness can never add up to a compelling inference of scienter. The Court notes that "the strength of the circumstantial allegations must be correspondingly greater if there is no motive." *Kalnit*, 264 F.3d at 142. The innocent explanation for the series of events at Wellington is far more compelling than the version of events tendered by Plaintiffs: someone raised an unfortunate accounting problem at one of Shiloh's 21 facilities, upon which management promptly conducted an investigation, identified culpable employees and corrected the errors, and issued a Restatement to the SEC amending their financial disclosures.

The contention that Defendants insisted on turning a blind eye to irregular accounting data at Wellington is not "cogent and at least as compelling" as the opposing inference of

responsible conduct by Defendants. All of the facts alleged, taken together and evaluated holistically, do not give rise to a strong inference of scienter.

    C.    Loss Causation

Because Plaintiffs fail to adequately plead scienter, the Court need not address the remaining requirements to plead a cause of action for securities fraud. *See In re China Mobile Games*, 2016 WL 922711, at *3.

    D.    Section 20(a) Claim

As Plaintiffs failed to sufficiently plead an underlying violation under Section 10(b) and Rule 10b-5, this Court dismisses the Plaintiffs' claim for liability under Section 20(a). *See In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 486 (S.D.N.Y. 2005) (Marrero, J.).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss is GRANTED. Any pending motions are moot. The Clerk of Court is directed to close this case.

SO ORDERED.

DATED:  New York, New York
           March 23, 2017

                                                  /s/
                                    THE HON. KIMBA M. WOOD
                                       United States District Judge