```
USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/19/18
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
RAYMOND THOMAS and WILLIAM
PORTER, individually and on behalf of all
others similarly situated,

                       Plaintiffs,

      -against-

SHILOH INDUSTRIES, INC., RAMZI
HERMIZ, and THOMAS M. DUGAN,

                       Defendants.
------------------------------------------------------X

No. 1:15-CV-7449 (KMW)

**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

This case arises from alleged fraudulent financial reporting by Shiloh Industries, Inc. ("Shiloh" or "the Company"), a publicly-traded manufacturer of automotive materials. The Court dismissed Plaintiffs' initial complaint because it failed to plead with particularity that any defendant had the requisite scienter to be held liable for securities fraud. On a motion for reconsideration, the Court declined to vacate the dismissal, but granted Plaintiffs leave to amend their initial complaint for the limited purpose of alleging facts demonstrating that Shiloh (as a corporate defendant) had the requisite scienter. Plaintiffs then filed a Second Amended Class Action Complaint ("SACAC"), which Defendants now move to dismiss. For the reasons stated below, Defendants' motion to dismiss the SACAC is GRANTED.

## I. BACKGROUND[1]

Shiloh supplies equipment to the automotive and commercial vehicle markets and other industrial customers. It specializes in materials and designs that reduce vehicle weight and increase fuel efficiency, as well as products that mitigate the harshness of vehicles, due to their noise and vibration. Shares of Shiloh, which is headquartered in Ohio, are publicly traded on the Nasdaq Stock Market.

In 2015, an accountant at Shiloh's Wellington, Ohio, Facility ("the Wellington Facility") sounded the alarm on possible fraudulent accounting. In response, Shiloh launched an internal investigation. The investigation revealed that the Wellington Facility's Controller, Eric Halterman, had been intentionally understating the Facility's costs. When Halterman's data was consolidated into the Company's financial reports, the effect was to falsely inflate Shiloh's net income. After Shiloh publicly announced the investigation, its share price fell. The share price dropped again after the Company restated its financials and admitted to investors that its internal controls on reporting were materially weak. A putative class of Shiloh shareholders then filed this suit.

So far, Plaintiffs have failed to convince the Court that they have a plausible claim. Plaintiffs filed their initial complaint on September 21, 2015. (ECF No. 1.) On February 21, 2016, Plaintiffs filed an amended complaint, which they corrected on February 23, 2016. (ECF Nos. 23, 28.) Plaintiffs' Corrected Amended Class Action Complaint, referred to herein as the First Amended Class Action Complaint ("FACAC"), alleged that Shiloh violated Section 10(b)

---

[1] Because most of the facts in the SACAC are facts contained in the First Amended Class Action Complaint and set forth in some detail in *Thomas v. Shiloh Indus., Inc.*, No. 15-CV-7449 (KMW), 2017 WL 1102664 (S.D.N.Y. Mar. 23, 2017) ("*Thomas I*"), they are only briefly summarized in this opinion. Greater detail is provided with respect to the new allegations in the SACAC.

of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10(b)-5 by materially misstating its finances to investors in 2014 and 2015. Plaintiffs also named Shiloh's CEO, Ramzi Hermiz, and its Vice President of Finance, Thomas M. Dugan, as defendants, alleging they individually violated SEC Rule 10(b)-5 and Sections 10(b) and 20(a) of the Exchange Act. On March 23, 2017, the Court dismissed the claims against all three defendants because Plaintiffs failed to plead with particularity that either Hermiz or Dugan had the requisite scienter for the alleged violations. *See Thomas I*, 2017 WL 1102664, at *6. Subsequently, on April 6, 2017, Plaintiffs requested that the Court reconsider the dismissal with respect to the claims against Shiloh as a corporate defendant. (ECF No. 40.) The Court granted Plaintiffs leave to amend the FACAC for the "limited purpose" of "rectify[ing] factual deficiencies and satisfy[ing] the pleading standard with respect to their corporate scienter claim." *Thomas v. Shiloh Indus., Inc.*, No. 15-CV-7449 (KMW), 2017 WL 2937620, at *5 (S.D.N.Y. July 7, 2017) ("*Thomas II*"). Thus, the sole issue in this round of pleading is whether Plaintiffs have sufficiently alleged corporate scienter so as to state a claim against Shiloh as a corporate defendant; no claims remain with respect to Hermiz or Dugan as individual defendants.

Plaintiffs filed the SACAC on August 4, 2017, which Defendants now move to dismiss. (ECF Nos. 45, 47.) For purposes of deciding the motion to dismiss pursuant to Rule 12(b)(6), the Court assumes that all factual allegations contained in the SACAC are true, but does not apply this principle to legal conclusions. *See Wilson v. Dantas*, 746 F.3d 530, 535 (2d Cir. 2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

The new allegations in the SACAC focus on the scienter of Halterman, the Wellington Facility Controller, and on Brian Harvey, Halterman's boss at the time of the alleged fraud. As the Wellington Facility Controller, Halterman was responsible for accounting at the Wellington

3

Facility, overseeing four employees. SACAC ¶ 32. Halterman reported to Group Controller Harvey. *Id.* In his role as the Wellington Controller, Halterman was tasked with providing updates on the Wellington Facility's financials during weekly two-to-three hour meetings at which controllers from Shiloh's various plants discussed their budgets and financial forecasts with Shiloh's Vice President. *Id.* ¶¶ 32, 63. According to Plaintiffs, this task meant that Halterman "functionally" reported directly to Shiloh's Vice President. *Id.* ¶ 32. In 2014 and 2015, Halterman perpetrated an accounting fraud that resulted in Shiloh overstating its net income in public securities filings. *Id.* ¶¶ 32, 54, 106. He was fired "after it all blew up" at the Wellington Facility. *Id.* ¶ 32.

Turning now to Harvey, Plaintiffs allege that he was complicit in Halterman's fraud, or at least reckless in not discovering it. *Id.* ¶ 106. As Group Controller, Harvey worked one step below senior management, reporting directly to Shiloh's Vice President. *Id.* ¶¶ 29, 33. In his role, Harvey oversaw approximately 25% to 30% of the company's plants, including the Wellington Facility. *Id.* ¶ 118. His responsibilities included reviewing Halterman's reports. *Id.* ¶ 33. Plaintiffs allege that the day after an accountant at Wellington confronted Harvey about the fraud, Harvey stated that he was planning to resign; he did so within the month. *Id.* A confidential witness stated that Harvey left "as a result the investigation into the Wellington Plant." *Id.*

## II. LEGAL STANDARD

"To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Progressive Credit Union v. City of New York*, 889 F.3d 40, 48 (2d Cir. 2018) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (applying the *Twombly* standard to a securities fraud claim). When the complaint alleges

4

securities fraud, it must satisfy the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and Rule 9(b) of the Federal Rules of Civil Procedure. Under Rule 9(b), a complaint alleging fraud "must state with particularity the circumstances constituting fraud," or otherwise face dismissal. Fed. R. Civ. P. 9(b); *see ECA*, 553 F.3d at 196; *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)). The PSLRA requires Plaintiffs to allege facts that give rise to a "strong inference" that the defendant acted with scienter. 15 U.S.C. § 78u–4(b)(1), (2). For an inference of scienter to be "'strong' [within the meaning of the PSLRA] . . . it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324.

Section 10(b) of the Exchange Act and SEC Rule 10b–5 make it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b–5(b). To state a claim under Section 10(b) and Rule 10b–5, "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)). The focus here is narrowed to the element of scienter—more precisely, whether the SACAC adequately alleges that Shiloh had the corporate scienter required to state a claim for relief under Section 10(b) and Rule 10b–5.

The law on corporate scienter in the Second Circuit has not changed in the time since the Court dismissed Plaintiffs' FACAC. Under this Circuit's law, a plaintiff can show corporate

5

scienter by pleading facts sufficient to create a strong inference either that "someone whose intent could be imputed to the corporation acted with the requisite scienter," *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195 (2d Cir. 2008), or that a corporate announcement is so important and "so dramatic" that it "would have been approved by corporate officials sufficiently knowledgeable about the company to know that the announcement was false," *id.* at 196 (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 710 (7th Cir. 2008)). Here, Plaintiffs proceed on the first theory. *See* Mem. Law Opp. Defs.' Mot. Dismiss ("Pls.' Opp.") 1–3 (ECF No. 49). They argue that Halterman and Harvey intended (or, as to Harvey, at least recklessly overlooked) the fraud, and that Halterman and Harvey's scienter should be imputed to Shiloh. The Company does not dispute that Halterman had the requisite scienter; rather, it argues that he was too low on the corporate ladder for his scienter to be imputed to it. As to Harvey, Shiloh argues the Plaintiffs have failed to adequately plead that he had scienter, and that, in any event, he was insufficiently senior for his scienter to be imputed to Shiloh. *See* Reply Supp. Defs.' Mot. Dismiss ("Defs.' Reply") 8–9, 12 n.3 (ECF No. 50).

Whether Plaintiffs have alleged facts allowing Halterman's scienter to be imputed to Shiloh is discussed first, followed by the issue of Harvey's scienter.

### III. DISCUSSION

#### A. Halterman

There is no "bright-line rule" for determining when an employee is sufficiently senior such that his or her scienter can be imputed to the corporate entity. *Barrett v. PJT Partners Inc.*, 16-cv-2841 (VEC), 2017 WL 3995606, at *7 (S.D.N.Y. Sept. 8, 2018) (Caproni, J.). This Court explained in *Thomas II* that courts in this district consider the employee's "role and rank within the company, as well as the employee's relationship to those who ultimately proffered the materially false information that defrauded investors." 2017 WL 2937620, at *3; *see also*

*Barrett*, 2017 WL 3995606, at *7 ("[C]ase law suggests that . . . the Court should consider the individual's relative seniority at the issuing entity and the connection between the executive's role and the fraudulent statements."). In line with this approach, courts have generally held that the scienter of a corporation's executive-level employees and corporate officers may be attributed to the corporation. *See, e.g., In re Marsh & Mclennan Cos. Sec. Litig.*, 501 F. Supp. 2d 452, 482 (S.D.N.Y. 2006) (Kram, J.) (imputing scienter to a corporation where at least two senior executives, as well as other employees, were aware of fraudulent practices); *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 627 (S.D.N.Y. 2005) (Stein, J.) (imputing the knowledge of a corporation's vice chairman, vice president, and managing director to the corporation). Similarly, courts in this district have held that the scienter of senior managers one level removed from the executive level may also imputed to a corporation. *See Patel v. L-3 Commc'ns Holdings,* No. 14-CV-6038, 2016 WL 1629325, at *14 (S.D.N.Y. Apr. 21, 2016) (Caproni, J.) (imputing the scienter of the segment CFO, who was "situated one management level down from the CEO and CFO" of the company).

The SACAC largely restates the allegations about Halterman contained in the FACAC, which the Court held failed to plead corporate scienter. *See Thomas II*, 2017 WL 2937620, at *5. In the FACAC, Plaintiffs alleged that (1) Halterman was responsible for managing the accounting at one of Shiloh's largest and most profitable facilities, FACAC ¶¶ 15, 51; (2) the Company's cost accountants, at least one of whom was a confidential witness in this case, reported to Halterman, *id.* ¶ 31; (3) Halterman reported to Harvey, the Group Controller, who in turn reported directly to Shiloh's Vice President, meaning only one person stood between Halterman and Shiloh's executive-level management, *id.*; (4) in Shiloh's SEC Form 8-K filing following the fraud, it referred to Halterman as its "financial leader" at the Wellington Facility, *id.* ¶¶ 51, 106; and (5) the alleged fraud at the Wellington Facility inflated the Company's net

7

income during Quarter 1 and Quarter 2 of 2015 by about 50 percent and 13 percent, respectively, *id.* ¶¶ 15, 73, 77, 85, 90, 108. The SACAC adds few new allegations about Halterman's role and rank within the Company, stating that Halterman (1) managed four employees at the Wellington Facility, which was the entirety of personnel involved in accounting at the plant, SACAC ¶ 32; (2) reported on Wellington's financials in weekly calls with Shiloh executives, *id.* ¶¶ 32, 63, 108; and (3) authored financial reports that were "rolled up and consolidated into Shiloh's financial statements with little or no substantive review by the Company's most senior accounting officers," *id.* ¶ 105. Plaintiffs also allege the following facts about the Wellington Facility in order to further illustrate Halterman's role and rank at Shiloh: (1) at the time of the fraud, the Wellington Facility was the company's second-largest plant in terms of total sales, *id.* ¶ 39; (2) the Wellington Facility was the largest seller by volume and sales total of StampLight, one of three brands sold by Shiloh, *id.*; (3) Shiloh executives managed the Wellington Facility, and, accordingly, Halterman, in a hands-off way, *id.* ¶ 65.

Taking the allegations as a whole, Plaintiffs still have not demonstrated that Halterman was sufficiently senior at Shiloh for his scienter to be imputed to the Company. In his role, Halterman was at least two levels removed from Shiloh's executive-level management: He reported to Harvey, the Group Controller, who in turn reported to the Company's Vice President of Finance. Far from being in charge of an entire division or region, Halterman supervised accounting at just one of Shiloh's twenty-one plants. The fact that Halterman updated Shiloh's executives on the Wellington Facility's financials during weekly calls does not change the nature of his role within the Company—that is, he remained a low- to mid-level manager responsible for just a slice of the Company's accounting. Plaintiffs' assertion that Shiloh managed the Wellington Facility (and thus Halterman) in a "hands-off" way does not alter this conclusion. Even crediting this conclusory allegation, Plaintiffs fail to explain why hands-off management

8

would elevate Halterman's relative role within the company in a way that changes the imputation analysis.

Plaintiffs urge this Court to find Halterman's rank at Shiloh akin to that of a "regional manager" or head of a business unit, arguing that courts in this district have imputed the scienter of such individuals to their employer corporations. Pls.' Opp. 12–13. But the decisions on which Plaintiffs rely involved employees who were comparatively more senior at their companies than Halterman was at Shiloh, and included allegations of scienter that went beyond a single individual. For example, in *In re Sanofi Securities Litigation*, it was a vice president of Sanofi, who also served as head of a corporate division and who reported directly to the corporate CEO—along with an assistant vice president for special projects—whose scienter was at issue. 155 F. Supp. 3d 386, 409 (S.D.N.Y. 2016) (Castel, J.). Plaintiffs also point to *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430 (S.D.N.Y. 2005) (Kaplan, J.), as a case in which the scienter of a regional vice president was attributed to a corporate defendant. *See* Pls.' Opp. 12. But *In re BISYS* also involved allegations that senior management had adopted an accounting policy of inflating certain revenues, ignored accounting employees who objected to the practice, and pressured its staff to inflate revenues—not simply that the scienter of the regional vice president sufficed to allege corporate scienter. *See* 397 F. Supp. 2d at 443. Plaintiffs' reliance on *In re VEON Ltd. Sec. Litig.*, No. 15-CV-08672 (ALC), 2017 WL 4162342 (S.D.N.Y. Sept. 19, 2017) (Carter, J.), is similarly misplaced, because plaintiffs there alleged that a "high-ranking" executive charged with overseeing one of the company's subsidiaries had scienter. *Id.* at *10 & n.3.

To be sure, where an employee falls on a corporation's organizational chart may not always be determinative of whether his or her scienter may be imputed to the corporation. But the fact that an employee is not part of senior management weighs strongly against imputation.

9

Judge Caproni recently considered this same issue in *Barrett v. PJT Partners Inc.*, and her analysis is instructive. *Barrett* involved a partner at an investment bank who had defrauded his clients, family, and the bank. The partner was a "managing principal" of a unit that accounted for over a quarter of the bank's annual revenue. *Id.* at *12. The unit had 14 partners, and the bank had 31 partners overall. *Id.* at *12. But, as Judge Caproni explained, the partner was not a part of the bank's senior management, did not report to senior management, and was not involved in making disclosures to the market nor in formulating controls for those disclosures. *Id.* at *8. Therefore, the court concluded, his scienter could not be imputed to the corporation. *Id.* Here, too, Halterman was not senior management, did not report to senior management, and was not involved in Shiloh's public disclosure procedures.

Plaintiffs alternately press the Court to adopt a theory of corporate scienter whereby the scienter of an employee who furnishes false information to corporate officials for inclusion in its public statements may be imputed to the corporation. Plaintiffs cite *Makor*, 513 F.3d 702, to support this argument. *See* Pls.' Opp. 8. *Makor* mentions this theory, but the court there did not rely on it, *see Makor*, 513 F.3d at 708, and Plaintiffs do not point to any decisions from this Circuit that have held a corporation liable solely on the basis of an employee furnishing false information, without taking into account the relative seniority of the official furnishing the information. Instead, Plaintiffs make much of *Knurr v. Orbital ATK Inc.*, 294 F. Supp. 3d 498, 515 (E.D. Va. 2018), which held "that the scienter of a lower-level employee can be imputed to the corporation for the purposes of corporate liability under § 10(b) where . . . that lower-level employee fraudulently furnishes information for a public statement and in so doing, intends to cause, and causes, a corporate officer to make a misrepresentation to investors." In support of this approach, the *Orbital* Court explained that Congress intended the Exchange Act to protect investors, and that the effect of a lower-level employee's intentional misreporting being adopted

10

by an unwitting executive in a company's public reporting is the same as if the executive had the intent to mislead. *See id.*

*Orbital*'s reasoning is unpersuasive. First, although the Exchange Act is intended to protect investors, it does not "expect management to be guarantors of the honesty of every employee." *Barrett*, 2017 WL 3995606, at *1. As the Sixth Circuit has explained:

> If the scienter of any agent can be imputed to the corporation, then it is possible that a company could be liable for a statement made regarding a product so long as a low-level employee, perhaps in another country, knew something to the contrary. Such a result runs contrary to the PSLRA, which increased the scienter pleading requirements to prevent strike suits.

*In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 475–76 (6th Cir. 2014) (internal citation omitted). Likely for this reason, no court in this district has adopted *Orbital*'s pure agency theory of liability for Section 10(b) claims, which would attribute scienter to the corporation on the basis of any low-level employee's intentional misbehavior. Rather, as described earlier in this opinion, courts in this district regularly analyze whether an employee is sufficiently senior for his or her scienter to be imputed to the corporation, rejecting *Orbital*'s pure agency theory of Section 10(b) liability. Indeed, this Court implicitly rejected such a theory in *Thomas II*, where it held that Halterman was not sufficiently senior for his scienter to be attributed to Shiloh based on the facts alleged in the FACAC. *See* 2017 WL 2937620, at *5.

This does not mean the individual with scienter and the individual who made the alleged misrepresentation need always be the same person in order for a plaintiff to plead corporate scienter. *See In re Braskem S.A. Sec. Litig.*, 246 F. Supp. 3d 731, 765 & n.14 (S.D.N.Y. 2017) (Engelmayer, J.) (holding that plaintiffs pleaded corporate scienter where they alleged that one executive had scienter, and another executive issued the allegedly misleading disclosure); *see also In re Marsh*, 501 F. Supp. 2d at 481 (noting that "there is no requirement that the same

11

individual who made an alleged misstatement on behalf of a corporation personally possessed the required scienter"). But this does not help Plaintiffs. Even assuming the maker of the false statement and the employee with scienter need not be one and the same, as Plaintiffs argue, the issue here is whether, given Halterman's (lack of) seniority, his scienter may be imputed to Shiloh. The answer is it may not.

**B.     Harvey**

Plaintiffs' argument that Harvey's scienter should be imputed to the corporation fails for a different reason: namely, the SACAC does not plead with particularity that Harvey had scienter at all. Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *S. Cherry St. v. Hennessee Grp. LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (quoting *Tellabs*, 551 U.S. at 319). At the pleading stage, under Rule 9(b), a fraud plaintiff may establish a "strong inference" of scienter, among other ways, "by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015); *see also ECA*, 553 F.3d at 198. Circumstantial evidence may support an inference of scienter where the relevant individual "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306 (quoting *ECA*, 553 F.3d at 199). At a minimum, a Plaintiff must show that the individual's conduct was "highly unreasonable" and "an extreme departure from the standards of ordinary care." *S. Cherry St.*, 573 F.3d at 109 (quoting *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)).

In asking the Court to draw a "strong inference" of scienter, Plaintiffs rely on the circumstances surrounding Harvey's resignation. *See* Pls.' Opp. 23. Specifically, Plaintiffs

12

allege that: (1) the day after one of the Wellington Facility's accountants blew the whistle on the fraud, Harvey announced that he was planning to resign, and subsequently did so, SACAC ¶¶ 33, 115; (2) two confidential witnesses gave conflicting accounts of the reason for Harvey's departure—one stated Harvey resigned because of the fraudulent accounting, id. ¶ 33, but the other said Harvey resigned in order to take a job that would allow him to spend more time with his kids, id. ¶ 115; and (3) Shiloh's public disclosures indicated that two employees were complicit in the fraud, and the timing of Harvey's departure gives rise to the inference that he was one of those two employees (Halterman being the other), id. ¶¶ 116, 117.

Taken together, the facts Plaintiffs allege about Harvey's conduct do not give rise to a "strong inference" of scienter. The logical conclusion from the allegations in the SACAC is that Harvey was, at worst, negligent in failing to detect Halterman's fraud. Even assuming Harvey left "as a result of the Company's investigation into the Wellington plant," SACAC ¶ 33, that fact does not give rise to the inference that Harvey was aware of the fraud before the accountants at the Wellington Plant alerted him to it, or that he acted "highly unreasonabl[y]" in failing to detect it. *S. Cherry St.*, 573 F.3d at 109 (quoting *In re Carter-Wallace*, 220 F.3d at 39). Plaintiffs do not identify any reports, statements, or the like to which Harvey had access that would have alerted him to the Halterman's misreporting prior to one of the Wellington Plant accountant bringing it to his attention. *See Dynex*, 531 F.3d at 196 (holding that plaintiffs failed to allege corporate scienter where they did not specifically identify reports or statements to which the corporate officer had access that would have contradicted the allegedly fraudulent corporate statements at issue); *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 358 (S.D.N.Y. 2012) (Pauley, J.) (holding that to to allege scienter based on recklessness, a plaintiff "must identify specific contradictory information that was available to the [defendant] at the time [it] made [its] misleading statements"). Rather, as in *Dynex*, the inference that Shiloh's

13

fraudulent public statements "were the result of merely careless mistakes at the management level based on false information fed it from below" is more plausible than the inference of scienter that Plaintiffs would have the Court draw. 531 F.3d at 196 (citing *Makor*, 513 F.3d at 710). Such careless mistakes and poor oversight would have given Harvey a reason to preemptively resign and seek other employment, providing a more likely explanation for Harvey's departure than the one Plaintiffs offer.

Lastly, Plaintiffs argue that Harvey's resignation was "suspicious," and that this can be indicative of scienter, relying on *In re Scottish Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176 (S.D.N.Y. 2007) (Scheindlin, J.). But the court in *In re Scottish Group* held that the plaintiff's complaint sufficiently alleged scienter *independently* of the suspicious circumstances of the departure of two employees. *Id.* at 394. It then stated that "additional highly unusual and suspicious facts" lent further support to the inference of scienter. *Id.* at 394 n. 176 Specifically, the resignations of two corporate officers in and of themselves were *not* sufficient to allege scienter, but rather "add[ed] to the overall pleading of circumstantial evidence of fraud." *Id.*

In sum, Plaintiffs fail to plead facts that lend themselves to an inference of scienter that is "cogent and at least as compelling as any opposing inference as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Accordingly, for the reasons above, Plaintiffs have not alleged that Shiloh had the requisite scienter to be liable for securities fraud.

### C. Leave to Amend

In a footnote, Plaintiffs request leave to amend the SACAC, should the Court grant all or part of Shiloh's motion to dismiss. *See* Pls.' Opp. 25 n.30. Defendants oppose this request. *See* Defs.' Reply 20 n.11. "Although Rule 15(a) of the Federal Rules of Civil Procedure

14

provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grant or deny leave to amend. Leave to amend may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *Kim v. Kimm*, 884 F.3d 98, 105 (2d Cir. 2018) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (internal citation omitted)).

Leave to amend in this case would be futile. Plaintiffs have already had one opportunity to amend, and were made aware of the deficiency in the FACAC, namely, the failure to plead corporate scienter. *See Thomas II* at *5 ("Because there is a possibility that Plaintiffs could amend their complaint to rectify factual deficiencies and satisfy the pleading standard with respect to their corporate scienter claim, Plaintiffs are granted leave to amend for this limited purpose."). This same deficiency persists in the SACAC. Because Plaintiffs have thus far been unable to cure this defect, and offer no indication as to how they might do so in the future, Plaintiffs' request for leave to amend is denied. *See Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006) (finding no abuse of discretion in district court's denial of an informal request for leave to amend "given that plaintiff's counsel did not advise the district court how the complaint's defects would be cured"); *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 506 (2d Cir. 2014) (affirming the district court's denial of leave to amend where plaintiff "entirely failed to specify how it could cure its pleading deficiencies").

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Second Amended Class Action Complaint is GRANTED in its entirety. Plaintiffs' Second Amended Class Action Complaint is DISMISSED with prejudice and without leave to amend. The Clerk of Court is directed to close this case.

SO ORDERED.

Dated: New York, New York
September 19, 2018

*Kimba M. Wood*
KIMBA M. WOOD
United States District Judge